# DORA L. FELVER v. CENTRAL ELECTRIC RAILWAY COMPANY, Appellant.

### Division One, January 14, 1909.

1. **NEGLIGENCE: Humanitarian Doctrine.** Where a driver of a wagon drove on a street car track ahead of an approaching car in the nighttime and was struck by it, the humanitarian doctrine assumes that he may have been negligent in so doing without taking all due precaution to look out for danger coming from behind, and that the pivotal question is one of fact, namely, Do the facts show that the motorman could have seen his peril in time by the exercise of due care to have avoided hitting him or his wagon?

2. **NUMBER OF WITNESSES: Rule Unenforced.** A ruling of the trial court that not more than a named number of witnesses would be heard, if unenforced, and appellant made tender of none that were excluded, is not reversible error.

3. ————: ————: **Not Made Ground for New Trial.** Besides, such ruling cannot be considered on appeal if it was not assigned as a ground in the motion for a new trial.

4. **NEGLIGENCE: Instruction: No Evidence.** The scope of the jury's duty is to try the case according to the law and the evidence, and not otherwise; and while they are entitled to draw inferences, the inferences must be deduced from the testimony, not from conjecture. An instruction hypothecated upon a conjecture should not be given.

5. ————: ————: ————: **Accident: No City Lights.** Where there is no testimony that deceased's death was the result of mere accident, no instruction defining accident, and barring a recovery if the injury was the result of accident, should be given.  If some known person or cause was to blame—for instance, if the injury resulted from the driver's contributory negligence, or was due to the motorman's failure to use ordinary care to avoid hitting him after discovering his peril— there is no room in the case for a defense on the theory of

a mere accident. Nor can it be said that the failure of the city to have proper lights at the street crossing is a sufficient basis for such an instruction.

6. ————: ————: ————: Harmless Modification. The defendant asked the court to instruct the jury that "an accident may happen and a person be injured or killed therein that is not caused by the negligence of any person connected therewith, and if the jury believe from the evidence that the death of the husband of plaintiff was the result of such mere accident or misadventure then your verdict must be for defendant." The court added the words: "By 'accident,' as the word is used in this instruction, is meant a casualty occurring without assignable cause and without fault upon the part of anyone," and gave it as amended. *Held*, that, as there was no evidence in the case that deceased came to his death as the result of mere accident, the instruction should not have been given at all; but, the definition of "accident" as "without fault on the part of any one" was not inapplicable, and did no harm.

7. ————: ————: Contributory: Proximate Cause: Humanitarian Rule. An instruction which tells the jury that plaintiff cannot recover if her husband's negligence in being upon the track in front of the approaching car was the proximate cause of his death, is unhappy in its terminology, and, where the case proceeds under the humanitarian rule, namely, that deceased was negligent but the motorman did not use ordinary care to avoid striking him after he discovered his peril, should not have been given, for it has no place in the case; but if the law of the concrete case was correctly given in another of defendant's instructions, it did not materially affect the merits.

8. ————: Driver on Track: Looking to Rear. A citizen who is driving on a public street and, getting on a railway track laid in the street, drives along that track, is not required, in order to exercise due care in front and behind, to constantly look to the front and to the *rear* for a car which the evidence does not show he knew was approaching.

9. ————: ————: ————: Duty of Motorman: Humanitarian Doctrine. A street car has no exclusive right to a public street. The motorman knows that his car will be present at a given point at a time certain and that it will occupy the track at that point with killing force; and if the driver ahead is unconscious of immediate danger, the law imposes on the motorman the high and stringent duty to exercise due care to save the life and limb of the citizen, regardless of the citizen's imprudence in placing himself in front of the danger controlled by the motorman.

Felver v. Railroad.

10. ———: ———: **Evidence: Demurrer.** The time was 8:30 or 8:45 of the evening of April 30th. The grade was nearly on a level. The motorman was experienced and the car's equipments were in order. The evidence does not show when the driver of a wagon got on the track and drove ahead with his back to the car, apparently unconscious of its approach. The motorman testified that he could have seen the driver a block away if the street lights at the corners near the point of collision had been going, and there was evidence that they were lighted and to the contrary. He also testified that he stopped the car within 50 feet, and there was evidence that it could have been stopped with safety to the passengers within from forty-five to one hundred and forty feet. *Held*, first, that it was for the jury to settle the conflict in the testimony; *second*, if the driver's wagon could have been seen a block away, there was an imperative call upon the motorman (whether by using the gong, air-brake or the reverse of his power or all of them) to commence at that distance away getting his car under such control that, with its present stopping equipment, it would have come to a stop in time to save the driver; *third*, if the driver was not on the track when the car was a block away, there was abundant evidence tending to show he was on the track when the car was at such a distance away that it could have been stopped before it struck the wagon if the motorman had been alert; and, *fourth*, a demurrer to the evidence, offered at the close of the whole case and not at the close of plaintiff's case, was properly overruled.

Appeal from Jackson Circuit Court.—*Hon John G. Park*, Judge.

AFFIRMED.

*John H. Lucas, Frank G. Johnson* and *Halbert H. McCluer* for appellant.

(1) The court erred in not instructing the jury to find the issues in favor of defendant and in submitting the case to the jury. Yarnell v. Railroad, 113 Mo. 580; Grout v. Railroad, 125 Mo. App. 552; Masterson v. Railroad, 204 Mo. 519; Eppstein v. Railroad, 197 Mo. 733; Markowitz v. Railroad, 186 Mo. 359. (2) The court erred in giving each of the following instructions at the request of plaintiff, over defendant's objections, as follows: 1P, 2P, and 17P: As to 1P: Authorities

under point 1, and Holmes v. Railroad, 207 Mo. 165; Cornovski v. Railroad, 207 Mo. 274. (3) The court erred in modifying each of the following instructions, and giving them as modified, as follows: 5 D, 6 D, 7 D, 11 D, and 16 D. The court also erred in modifying instruction 15 D, giving same as modified, and also in withdrawing 15 D, as modified, after it had been given to the jury. As to 5 D: Feary v. Railroad, 162 Mo. 99; Maxey v. Railroad, 95 Mo. App. 309. As to 6 D: Hanheide v. Railroad, 104 Mo. App. 330; Kellny v. Railroad, 101 Mo. 67; Hogan v. Railroad, 150 Mo. 36. As to 11 D: Van Bach v. Railroad, 171 Mo. 346; Boyd v. Railroad, 105 Mo. 380; Cole v. Railroad, 121 Mo. App. 605; Guyer v. Railroad, 174 Mo. 350. (4) The court erred in limiting the number of witnesses that defendant was permitted to have testify. Railroad v. Aubuchon, 199 Mo. 360, Markham v. Herrick, 82 Mo. App. 330; Stewart v. Emerson, 70 Mo. App. 484. (5) The court erred in admitting the following evidence over defendant's objections, as follows: First: Evidence of Howard Elder in relation to similarity of car No. 152 to other cars. Langston v. Railroad, 147 Mo. 465; Gutridge v. Railroad, 94 Mo. 468; Boettger v. Iron Co., 136 Mo. 536; Taylor v. Railroad, 185 Mo. 255. Evidence of same witness as to within what distance car could be stopped. Heinzle v. Railroad, 182 Mo. 555; Benjamin v. Railroad, 50 Mo. App. 610. Second: Evidence of Bengert, as to stopping of cars. Third: Evidence of Mercer, as to how far one sould see by headlight on the car, also evidence of the same witness as to how soon the car could acquire its full speed.

*Kelly, Brewster & Buchholz* and *Reed, Yates, Mastin & Harvey* for respondent.

(1) The court did not err in sending this case to the jury. Upon its facts it is very like Latson v. Railroad, 192 Mo. 460. If the street lights were burning (a

question for the jury) the motorman could have seen deceased on track a block away. He admitted that he did see him forty feet away, driving in a trot. The deceased paid no attention to warning. From the point where motorman admits he first saw deceased to point where he was struck was 104 feet by actual measurement. All the evidence showed that the car, going at ten to eleven miles per hour, could be stopped in fifty feet or less. It is therefore mathematically demonstrable that this is a case for the application of the last-chance doctrine. Strode v. Railroad, 87 S. W. 976; McQuade v. Railroad, 200 Mo. 158; Lander v. Railroad, 206 Mo. 464; Rapp v. Railroad, 190 Mo. 161; Klockenbrink v. Railroad, 172 Mo. 678; Schafstette v. Railroad, 175 Mo. 154. (2) Plaintiff's instruction 1P is not open to objection. It correctly states the law. Rapp v. Railroad, 190 Mo. 154. Morever, Motorman MacAllister testified that the car could have been stopped in fifty feet, with safety to passengers after he saw deceased. Deceased's peril commenced the moment the motorman saw he was paying no attention to signal—was not attempting to get off track. If the motorman could thereafter have stopped or checked the car, thereby preventing the collision, it was his duty to do so. This the instruction submits. Rapp v. Railroad, supra. See many authorities cited at page 161; Latson v. Railroad, 192 Mo. 460. (3) Defendant's instruction 6D was more favorable to defendant than it was entitled to. It should not have been given at all. There is no question of contributory negligence in this case. It was submitted solely on the last-chance doctrine. Klockenbrink v. Railroad, 172 Mo. 689. Contributory negligence will not prevent recovery in a case bottomed on the last-chance doctrine. The duties of humanitarianism begin after the negligence of another is apparent. Kellny v. Railroad, 101 Mo. 67; Morgan v. Railroad, 159 Mo. 262; Zander v. Railroad, 206 Mo. 464. (4) There was no tender of witnesses and refusal of

their testimony by the court. So far as the record shows, defendant had the benefit of all the witnesses it had. No such point is raised in the motion for new trial.

LAMM, P. J.—Dora L. and Lyman A. Felver were *baron* and *feme*. Defendant is a domestic corporation domiciled in Kansas City in the carrying line, owning and operating a street railway and the cars on Brooklyn avenue, a public thoroughfare of that town. This avenue runs north and south, and between Nineteenth and Twentieth (transverse streets), crosses a bridge known as the Belt Line bridge. On a Saturday, the last day of April, 1904, its car (north-bound, between eight and nine o'clock in the evening) ran down and killed Mr. Felver, a little south of said bridge. He was riding on the seat of an ordinary one-horse spring wagon, driving his horse at a brisk trot on defendant's track, his wagon ladened with flowers in pots or baskets going to customers. He was a one-legged cripple, used a crutch, was of some age and his hearing and eyesight are not disclosed.

His widow within the statutory period sued for the statutory penalty as for his negligent and wrongful death. From her judgment, entered on a verdict of $5,000, defendant appeals.

The case on the pleadings is this:

The petition charges that the car was negligently and carelessly run against Mr. Felver; that it struck his wagon, hurled him to the street, breaking the bones of his body and killing him instantly; that defendant's employees having the car in charge carelessly and negligently failed to give him any warning of its approach by bell or otherwise; that they carelessly and negligently ran the car at a high and dangerous rate of speed; and that said employees saw or by the exercise of reasonable care and diligence might have seen him in imminent peril upon the track, in time to have slack-

ened the speed of the car or stopped it and avoided his injury, but carelessly neglected to do so.

The answer was a general denial, supplemented by the affirmative plea that if decedent received injuries described the same were caused by his own fault and negligence.

The reply put in issue the defense of contributory negligence.

The case on the facts is this:

From Twenty-first street north to Twentieth defendant's Brooklyn track is on a down grade of about five per cent. From the south line of Twentieth street to and over the Belt Line bridge, the grade is about level—to speak accurately, less than one per cent down. From the north line of the bridge to Nineteenth street, the down grade is more—say, eight or nine per cent. All sides agree that the car was run by electricity and equipped with an airbrake, weighed about 55,000 pounds, had four motors, was forty-three feet long from bumper to bumper, was about three-fourths loaded, was in charge of a motorman and conductor, with its equipment in working order. Among these was an electric headlight, shown to so throw its rays that an object could be discerned on the track forty feet ahead. Both sides agree that the hour was such that street lamps were due to be lighted. They agree that Felver was killed close to Twentieth street, between it and the Belt Line bridge. Figuring from the north line of Twentieth to the bridge, the distance is, say, 104 feet. If one figures from the south line of Twentieth, fifty feet would have to be added for its width—that street being fifty feet wide and, coming from the east into, stops at Brooklyn avenue. At the southeast corner of Brooklyn and Twentieth was a street gas lamp. Diagonally across from that corner, to what would be the northwest corner of Brooklyn and Twentieth (if Twentieth were cut through), was another. Plaintiff put in proof to the effect that both these lamps were lit

at the time— defendant much to the effect that neither was lit, and some tending to show that one was not lit. The car was running at, say, ten or eleven miles an hour from Twenty-first down to Twentieth. The usage in running cars north between these streets was to put on a full head of power on the ridge at Twenty-first street and, when the speed was well fed up, let the car coast down under its gravity to Twentieth street. As it approached Twentieth, it would be put again under control. Plaintiff's proof tended to show that the wagon was struck close to the south line of the crossing of Twentieth and Brooklyn— some of it, say, fifteen feet south; defendant's that it it was struck some distance north of the north line of the crossing, say, twenty-five feet north. It stands conceded that the impact of the car was full and directly in the rear of the wagon—the mark of the headlight showing on the hind end-gate. There is no dispute that when the car stopped Mr. Felver's body was found crushed under its forward trucks, and jacks had to be used to raise the car to get out his remains. The wagon was struck with violence. One of its wheels was broken off, ran down the street and could not be found. The seat of the wagon, the driver's whip, his crutch and his flower pots and baskets were found scattered along for about the length of a car. The glass of the vestibule of the car was broken and glass was found on the pavement for about the same distance. Blood was found there for eight or nine feet. The horse ran away with what was left of the wagon. There was evidence tending to show that the car stopped after the first impact in its length or less, and much other that the distance was much greater, say, a hundred feet and more. While Mr. Felver seems to have been knocked from his wagon by the force of the collision yet just when he fell off and was run over is not shown. If his fall was at the moment of the impact, then, under some of the

proof, he was evidently shoved a good ways along the track before being crushed. If, on the other hand, he fell when the horse gathered momentum to run away, then he may have been run over where he fell or maybe on that view he was shoved a much less distance and then run over. There is point-blank evidence that Felver in driving at a sharp trot north was unconscious of the death stealing on him from behind.

It would be waste time to set forth the *minutiae* of the testimony. There were many disagreements in it to be harmonized, if at all, by the jury and presenting no problem to an appellate court involving questions of law. For instance, there was evidence tending to show that no alarm signal was given in time to have availed Mr. Felver. There was much to the contrary. There is no contention the car was running in violation of ordinance speed.

If the brakes of a car are set they should be let off before the reverse power is applied—this for obvious reasons. While the motorman does not so testify yet there is evidence pointing to the fact that the "overhead" blew out after the reverse was put on. The witness who states that fact says it blew out at the instant the car struck the wagon. As we see it such result might be produced by reversing before the brakes were let off—but it is not claimed that this accident to the power caused the collision and the matter need not be pursued; for the mischief, if any, dates back of that in not seeing the danger and in not beginning soon enough to stop.

The case proceeds on the theory that unless the humanitarian doctrine applies there can be no recovery. That theory assumes, to start with, that Mr. Felver may have been negligent in driving north on defendant's track in the nighttime without taking all due precaution to look out for danger coming from behind. That theory raises this pivotal question of fact, *viz.*: Do the facts show that the motorman could have

seen Mr. Felver's peril in time by the exercise of due care to have saved his life?

On this view of the case, the testimony of the motorman will presently be set out with some particularity. We will not load down the opinion with the testimony (abounding in the case) of experts relating to stopping cars. Suffice it to say that the tendency of plaintiff's was to the effect that the car could have been stopped by the exercise of due care in the use of its equipment in, say, from thirty-five to forty feet. *Contra,* there is a mass of testimony from defendant's to the effect, as we read it, that it could not have been stopped short of from 80 to 140 feet. Some say 99; some, 110; some, 125; some, 140 feet. As pointing the difference between theory and fact, it appears from the motorman's evidence (as will presently be seen) that he did stop it in fifty feet with safety to the passengers. He testifies, too, that it could be stopped under the conditions present in that distance with safety to them.

Attending to the testimony of the motorman: He says he broke in as motorman and had been in that service for four or five years. Left the south end of the line with his car after eight o'clock on the evening of April 30, 1904. Reached the point of the accident about 8:45. Last prior stop was at Twenty-first street for passengers. Ran from Twenty-first to Twentieth at ten to eleven miles an hour. At Twentieth the grade was practically level but there is a very slight upgrade at the Belt Line bridge. Rang his bell for Twentieth street. Car was right on the south line of Twentieth when he first saw the wagon squarely on the track in front going north. Saw an object, a man, on the seat forty feet away. His headlight threw its rays that far ahead. Did not see the wagon get on the track.

(NOTE: It is well to state at this point that there was no testimony showing or tending to show when

Mr. Felver came on Brooklyn avenue nor what distance he had traveled north on that avenue or on defendant's track.  He was evidently exposed to danger sometime before he was discovered.  When first seen he was going his way directly north on the track.)

The motorman says it was dark at the place because the street lamps there were not lit; that if the lamps had been lit as they had been at other times he could have seen objects ahead "quite a distance." *That if they had been lit he could have seen an object on the track at Twentieth street when his car was at Twenty-first, a block away.*  When he discovered the object on the track, the first thing he did was to throw on his air and ring his bell. Did both simultaneously. It (the air) checked his car a little.   Then he reversed. Pressed on this point by a question, *viz*: "How far did your car run after you threw on your air?" he answered, he couldn't say as to that.  "I threw the air and reversed right away."   He continued as follows:  "When I saw him and the man didn't make any motion to get out of the way, I reversed the car at once."  The record shows the following:

"Q.  How far did your car run after you first attempted to stop it, before it came to a stop?  A.  Before I came to a stop?

"Q.  Yes, sir.  A.  I suppose it ran about fifty feet.

"Q.  About fifty feet?  A.  Yes, sir.

"Q.  Then you attempted to stop your car fifty feet before it finally came to a standstill?  A.  Yes, sir.

"Q.  Could it have been more than fifty feet? A.  I don't think it could.

"Q.  You don't think it was over fifty feet?  A. No, sir.

"Q.  In what space could you stop your car in the condition your car was at the time of the accident, on a grade such as you had at the place of the accid-

ent, with your rails in the condition they were in at the time of the accident, by applying all the means at your command, with all the means possible, with safety to the passengers?

"Q. Now answer the question, please. The shortest space you could stop your car by applying all the means at your command with safety to the passengers? A. Well, about fifty feet."

Continuing he testified that he sounded his gong when he first discovered the man; that the man paid no attention to the gong. His "eyes were wide open and right on him" until he noticed that he paid no attention. That the right way to apply air was to apply it partially at first, then all. If you apply it all instantly it is liable to slide the wheels. His car ran ten feet after he struck the wagon. The wagon went on down the street and the man was thrown out backward. The man was not dragged; the glass in the vestibule and the headlight were broken by the impact. He was looking directly ahead all the time; didn't lose his head but was excited. Didn't know how fast he was going when he struck the wagon but hit it "a pretty good lick." He had so nearly reduced the speed and come to a standstill that the car after the blow ran no more than ten feet until it came to a stop.

. On such record, it is argued there was no case for the jury on the law, therefore a demurrer to the evidence should have been sustained. Counsel seeks to disturb the judgment on other points assigned as error— e. g., in the giving and refusing of instructions, in rulings on the admission of testimony and in limiting the number of witnesses.

Is there soundness in any errors assigned? In our opinion there is not. This, because:

(a) At a stage of the trial when defendant was putting in its evidence, the learned trial judge said:

"Just a minute; I am not going to listen to all

these witnesses; you have got about twenty-five or
thirty here. Mr. Clerk, let the records show that the
defendant brings into court this morning nineteen wit-
nesses, and that the court announces that it will not
permit the introduction of more then seven witnesses
on any one proposition in this case.''

To that rule passed by the court and announced
*ore tenus,* defendant's counsel excepted and ''do still
except.'' Conceding the ruling wrong, yet they tender-
ed no evidence and no witness that was excluded under
it. Hence, there is nothing to show their client was
hurt a whit by it. In that condition of things (to speak
softly) it became in the eye (or ear) of the law a
*brutum fulmen*—it was a mere threatening *noise* and
in the air. Manifestly, we ought not to reverse on that
account. Counsel rely on Railroad v. Aubuchon, 199.
Mo. 352. But there are vital distinctions between that
case and this to be seen at a glance.

Not only so, but the point is not preserved for re-
view. The attention of the trial court is in nowise
directed to said rule in the motion for a new trial.
It, therefore, had no chance to correct its own error,
if error it was. This is a court of *last* resort on errors.
The court of *first* resort is the trial court itself.

The point is without merit.

(b) It is next assigned for error that improper
evidence was admitted. We shall not develop the
assignment; for we have gone over the evidence—have
interpreted it in the light of its context and the purpo-
ses for which it was introduced—have weighed and
considered the objections of counsel and their com-
ments *arguendo,* and have come to the conclusion that
the case was well tried in that behalf. The point is
ruled against defendant.

(c) It is next argued that plaintiff's second in-
struction was improper. That instruction is:

''The court instructs the jury that the terms ordi-
nary care, as used in these instructions, is the care

which an ordinarily careful and prudent person would exercise under the same or similar circumstances, and negligence is the failure to exercise ordinary care.''

The instruction in the form given is so trite as to be but a common-place of the law. To cite authority for it is vain and useless. It is of such everyday use as a lamp hung up to guide a jury in negligence cases that it may be said through venerable age and much use to have reached the dignity of a maxim. Of maxims, Lord Coke says: ''A maxim is a proposition to be of all men confessed and granted without *proof, argument, or discourse.*''

In fact, what counsel say in argument lends countenance to the notion that they did not strike at instruction number 2 but aimed a blow at instruction number 1, and, by inadvertent obliqueness in aim, hit the wrong instruction. This suggestion gathers force from the fact that it is insisted there was no evidence tending to show that, with safety to its passengers, the car could have been stopped with ordinary care after Felver's peril was or should have been known. It is argued further that the instruction assumes that ''being on the track was being in a position of peril.'' Assuming that counsel had in mind instruction number 1 given for plaintiff, the consideration of the point merges itself logically in the demurrer to the evidence to be considered in a little while.

(d) Defendant asked and the court refused and modified the following instruction:

''The court further instructs the jury that an accident may happen and a person be injured or killed therein that is not caused by the negligence of any person connected therewith, and if the jury believe from the evidence that the death of the husband of the plaintiff was the result of such mere accident or misadventure then your verdict must be for defendant.''

The court put on it an addendum, *viz*: ''By 'ac-

cident,' as the word is used in this instruction, is meant a casualty occuring without assignable cause and without fault upon the part of anyone," and gave it as amended.

Learned counsel complain of the addendum, but, on this record, without good cause. The word "accident" is used in more senses than one. For example, an injury arising from actionable negligence is often spoken of in discourse, pleadings, instructions and law books as an "accident," and such an event comes technically within certain shades of meaning of the word. In this case the court instructed on the event itself, and the form of "accident" in defendant's mind in drafting that instruction should be limited by definition in order not to create confusion in the minds of the triers of fact. [Zeis v. Brewing Assn., 205 Mo. 1. c. 648, *et seq.*] We are of opinion, *first*, that the instruction had no place in the case. There was no testimony tending to show an accident in the sense of this instruction. On the record before us some known person or cause was to blame, to-wit, either the decedent by his contributory negligence or the defendant by its negligence. *Second,* an excellent author [Black, Law Dictionary, *tit.* "accident"] says that "accident" (*inter alia*) means: "the effect of an unknown cause; a casualty." To that effect is the Zeis case, *supra,* and authorities cited. It is argued that the phrase, "and without fault upon the part of any one," had the effect to exclude from the jury's mind the fact or theory that by the fault of some *third* party the street lights may have been put out before the accident, thus causing the death of plaintiff's husband by putting him in the dark. That theory or fact, counsel say, would have been an *accident* so far as the defendant is concerned under the scope of the original instruction and is barred by the amendment. We need not decide whether the act of a third party would be

216 Sup—14

technically the kind of accident dealt with in the instruction, but hold that the jury had no business with such a theory or such a hypothetical fact. And this, because there was not a glimmer of evidence near or remote to sustain it. It at best is but a guess or conjecture and if entertained would lead to confusion and mischief in the jury room. The scope of a juryman's oath is to try the case according to the law and the *evidence*, and not otherwise. And while a jury is entitled to draw inferences, they must be deduced from the testimony, not from conjecture.

We cannot say the court's definition of the word "accident" was inapplicable or did harm, if the instruction was to go to the jury at all.

The point is ruled against defendant.

(e)  Defendant asked the following instruction:

"6. Although you may believe from the evidence that the death of the plaintiff's husband was caused by defendant's negligence, yet if you further believe from the evidence that the deceased was guilty of negligence in driving upon the railroad track, and such negligence was concurrent with that of defendant, your verdict must be for the defendant."

The court refused it in that form but amended it by inserting before the words "your verdict" the words "and that deceased's negligence in being upon the track was the proximate cause of his death" and gave it as modified. Complaint is made of the modification. Of this complaint we observe: The instruction was properly refused at the outset. The law of the concrete case had been given on behalf of defendant in its eighth instruction, *viz*:

"Lyman A. Felver, the deceased husband of plaintiff, was required under the law to exercise ordinary care—that is, such care as a reasonably prudent person under like circumstances would have exercised for his own safety, and unless he did so, the plaintiff cannot recover.

"It was his duty before driving on or so near the track as to be struck, to look and listen for passing cars, and unless you shall find from the evidence he did both look and listen, and looking could not see, or listening could not hear, the approaching car, then plaintiff cannot recover; and this is true even though you may believe that the car was being run at a rapid rate of speed and the gong was not sounded; unless you shall further believe that after the motorman saw or might have seen that Felver, the deceased husband of plaintiff, was in a position of peril and would not extricate himself therefrom, he had time to have stopped the car before striking the wagon, with due regard to the safety of the passengers and negligently failed to do so, and unless you so believe, your verdict will be for the defendant, and on this issue the burden of proof rests upon the plaintiff."

The sixth instruction could only have the effect of bothering the jury in trying to reconcile its verbiage with the eighth. But counsel argue that, as given, it was bad and held out a false light to the jury. They say it told the jury that decedent's contributory negligence before it could operate as a defense must be the proximate cause of his death. They say that is not the law. That the correct rule is that where the negligence of decedent directly contributed with that of defendant to produce the injury there can be no recovery. [Hogan v. Railroad, 150 Mo. l. c. 55, and authorities cited.] True it is that if there is mutual concurrent negligence in both parties there can be no recovery. True, there is no comparative negligence in this State. True it is that concurrent negligence, that is, coincident in time and place, defeats recovery. But this case, as said, proceeds on the assumption that Mr. Felver was guilty of an antecedent act of negligence. It proceeds on the assumption that if defendant, after it had the last clear chance, neglected under the humanitarian rule to see his peril and avoid his injury by

the exercise of ordinary care then there should be a recovery. Keeping that distinction sharply in mind, while the amendment in terms was unhappy in the use of learned terminology yet we cannot see how it materially affected the merits of the case when considered with defendant's 8th instruction, and with the whole trial theory of the case.

The point is disallowed to defendant.

(f)    Other complaints are made to the giving and refusing of instructions, but we deem them without substantial merit and pass to a consideration of the broad contention that the demurrer prayed and refused at the close of plaintiff's evidence should have been given.

The only consideration due that contention arises in the light of all the evidence and not in that of plaintiff's alone. This is so because defendant did not stand on its demurrer but went on and put in its own case on the facts. At root the contention in final analysis narrows itself to two simple asking propositions, *viz*: (1) Must a citizen who is driving on the people's highway and who, getting on the track of a street railway, laid in said highway, is driving along that track—must such a man constantly look to the front and to the *rear* in order to exercise due care in front and behind? (2) Is there substantial evidence tending to show that defendant's motorman could have seen decedent (in the environment of place, time, light and other conditions existing) on the track ahead in time to have saved his life by the exercise of due care? The first proposition, we think, must be answered, No—the second, Yes. A motorman knows that he and his car are present, that the car is to proceed at that immediate time to occupy with killing force the track ahead. The citizen is unconscious of the immediate danger. That situation forces upon the motorman a high and stringent duty—the duty of saving life and limb by his exercise of due care, regardless of the im-

prudence of the citizen in placing himself in front of the danger controlled by the motorman. [Petersen v. Railroad, 199 Mo. 331; Kennayde v. Railroad, 45 Mo. l. c. 262; Klockenbrink v. Railroad, 172 Mo. 678; Schaf-stette v. Railroad, 175 Mo. 142; Riggs v. Railroad, *infra,* p. 304; Rapp v. Railroad, 190 Mo. 144, and cases cited; Deschner v. Railroad, 200 Mo. l. c. 329; Latson v. Railroad, 192 Mo. 449.]

Those cases promulgate the rule that the street car company has not an exclusive right to the street. At most the rights of the company and the rights of the citizen in a public street are mutual; and correlative rights to its use must be regulated by the exercise of due care. Says this court in the Kennayde case, *supra,* through WAGNER, J.: "The unfortunate Kennayde had the same right to pursue his course that the defendant had to run the train on its track. The rights of the people of Kansas City to travel on and use their own streets and thoroughfares, are not inferior or subordinate to those of the railroad company. They each have a right to exercise their privileges in a lawful manner, and each are equally bound to use caution, care, and diligence to avoid accidents."

Says BRACE, C. J., In Banc, in Rapp v. Railroad, 190 Mo. 161-2: "Plaintiff had as much right on the street as did defendant, and in pursuing his way to be on that part of the street over which the defendant's track was laid. It was his duty to pursue his way with due care for his own safety, and the safety of others, and if, negligent of the former, he went in the way of defendant's car in such close proximity thereto as that the servants of the defendant could not by the exercise of ordinary care prevent injury to him, he has himself only to blame for his injuries, and he ought not to recover, and so the court in effect instructed the jury. On the other hand, it was the duty of the servants of the defendant to pursue their way on defendant's track in the street with due care for the safety of all

persons that might be on the track and not to injure them if within their power to prevent it by the use of ordinary care, and if disregarding this duty they did thereby injure the plaintiff, he ought to recover for those injuries, and the court in effect so instructed the jury, and this is all there was to the case.''

Here is a car plunging down grade in the public street of a populous city. The shadows of night have fallen. If a driver is on the track shortly ahead of such approaching car and going with his back to it, he is necessarily in peril. The duty being upon the motorman to not run him down if by the exercise of a care commensurate with the environment and circumstances he can prevent it, the only remaining question is proposition No. 2—*i. e.,* could he see him driving on the track with his back turned and apparently unconscious of his peril in time to have stopped the car by the exercise of that care?

The record shows he could have seen him, if the street lights were lit, at least a block away. It was for the jury to say under the proof whether street lights were going. The motorman testified he stopped the car within fifty feet and that a car going as that one, with its equipment, could be stopped with safety to the passengers in fifty feet. Plaintiff's testimony showed it could be stopped in a shorter distance. Defendant's that it could be stopped in from, say, one hundred to one hundred and forty feet. We have nothing to do with this conflict in the testimony. It was for the jury. We hold there was evidence making a case for the application of the humanitarian rule. If Mr. Felver's wagon could have been seen a block away, then, there was an imperative call upon the motorman (whether he used gong, air-brake or the reverse of his power or all of them together) to commence at such distance away getting that car under such control that, with its present stopping equipment, it would have come to a stop in time to have saved the citizen. If de-

cedent was not on the track when the car was a block off there was abundant evidence tending to show he was on the track when the car was such distance away it could have been stopped before it struck the wagon, if the driver was alert.

The case was well pleaded, well tried and well decided. Accordingly, the judgment is affirmed. All concur.