CLYDE HOWSER, Appellant, v. CHICAGO GREAT WESTERN RAILROAD COMPANY.—5 S. W. (2d) 59.

Division One, April 11, 1928.

*K. D. Cross, W. T. Meikle, Duvall & Boyd* and *Miles Elliott* for appellant.

*Brown, Douglas & Brown* for respondent.

SEDDON, C.—Action under the Federal Employers' Liability Act to recover damages in the sum of $100,000 for personal injuries alleged to have been suffered by plaintiff, who was engaged at the time of his injury, on September 20, 1924, as a brakeman in defendant's service, which injuries are alleged to have been caused by the negligence of defendant railroad company. It is admitted in the record by the parties that both the plaintiff and the defendant were engaged in interstate commerce at the time of plaintiff's injury, and, therefore, that the action is properly triable under the Federal act aforesaid. Plaintiff's alleged injuries were sustained while he was in position on the side, or, more accurately, the corner, of a steel railroad car by coming in contact with the gate, or gates, of a stock pen owned and maintained by defendant at Blockton, Iowa, and located upon its railroad property. The action was tried and submitted to a jury, resulting in a verdict for the defendant. After an unsuccessful motion for a new trial, plaintiff was allowed an appeal to this court from the judgment entered upon said verdict.

The specification, or ground, of negligence upon which the cause was submitted is thus averred in the petition:

"That at the town or station of Blockton, in the State of Iowa, defendant, in the operation of its railroad and business as a common carrier for hire, owns and maintains, and then owned and maintained, stock pens for the purpose of confining live stock about to be loaded into or unloaded from defendant's trains and cars; that at all the times herein mentioned defendant kept and maintained a side track, commonly called a 'stock track,' at and along and by the west side of said stock pens, and that on the west side of said stock pens, next to defendant's said stock track, defendant kept and maintained certain large and massive gates so built and constructed that when same were opened they would extend from said stock pens to the side of a car standing on defendant's said stock track, so as to form a chute through which to drive stock to and from defendant's cars and stock pens, and that said gates, when standing open, extended so near to the east side of any freight car which might be then and there passing along and over defendant's said stock track that same would injure any employee of defendant who might be on the east side of any such car as same passed by said gates;

"That defendant then and there negligently suffered and permitted said gates to be and stand open when, by the exercise of ordinary care,

it would have closed same before plaintiff was injured and have prevented plaintiff from being injured, as hereinafter alleged;

"That defendant, its agents, servants and employees, whose duty it was so to do, knew or by the exercise of ordinary care would have known that said gates were then and there standing open as hereinafter alleged, and negligently failed to close the same, and then and for a long time prior thereto negligently permitted said gates to continuously remain open; . . .

"That defendant negligently failed to keep said gates closed and locked when same were not in use, and negligently failed to provide proper means for keeping said gates closed and locked when same were not in use; . . .

"That on said 20th day of September, 1924, while he was in the performance and discharge of his duties as a brakeman for defendant as aforesaid, and in obedience to the order of defendant's engineer, as aforesaid, plaintiff had assumed, or was about to assume, a position on the east side of defendant's train and cars then and there being moved along said stock track past said gates, and was, by reason of the negligence and negligent acts of defendant, and of each of the acts of negligence of defendant as hereinbefore alleged, caused to strike and to be struck by one of the gates of said stock pens, which said gates were then and there standing open by reason and as a direct result of the negligence of defendant, as aforesaid, and was seriously and permanently injured."

The answer admits plaintiff's employment at the time of his injury, and that he sustained some injury, but denies each and every allegation of the petition. The answer, furthermore, pleads that plaintiff was familiar with the obstructions at the place where he was injured; that the danger of passing said obstructions in the position occupied by plaintiff was fully known and appreciated by him, and that plaintiff assumed the risks and dangers incident to such employment while passing said obstructions; that, at the time plaintiff was injured, he was guilty of negligence in failing to look out for the obstructions which were on the east side of defendant's train of cars, and in placing himself in a position where he might be struck by such obstructions; and that such negligence on his part contributed directly to cause his injuries. The reply is a general denial of the allegations of the answer.

The evidence, in substance, tends to show the following facts: Plaintiff was twenty-eight years of age and was an experienced railroad brakeman, having worked in that capacity for more than three years for three different railroad corporations. He had been employed by defendant, however, only seven or eight days before his injury as a front, or head, brakeman on local freight trains operated by defendant between Des Moines, Iowa, and the town of Conception,

Missouri. His duties were "to couple and uncouple cars, throw switches, and do anything that was necessary to be done," according to his own testimony. At the time he was employed by defendant, he was instructed by defendant's trainmaster that there were permanent structures along defendant's tracks that would not clear a man on the side of a car, but "nothing about swinging structures, only, in case we should find gates open, to shut them; a water crane swinging out, put it back to its proper position, as a safety first plan, which the company insists on;" and he was warned of the danger of being struck when attempting to pass permanent structures.

The town of Blockton, Iowa, is located upon defendant's railway line. The defendant maintains three tracks through said town, extending in a northerly and southerly direction, the mainline track being the westerly track, the passing track in the middle, and the house, or stock, track being the easterly track. The passing, or middle, track connected at its north end with the main-line track, and the house, or stock, track connected at its north end with the passing track. Along and on the east side of the house, or stock, track were located several permanent structures and buildings. The structure nearest the north end of the house track was a building of the Standard Oil Company, which building was located ten feet back and east from the house track, and there was also a post, used for unloading oil, located eight feet back and east from the center of the house track, the clearance between the said post and the side of the widest car used by defendant being two feet, ten and one-half inches, not including the space occupied by grabirons and ladders upon the sides of the cars. South of the Standard Oil Company structures about 150 or 160 feet, and relatively near the north end of the house track, are located the stock pens of defendant, with an appurtenant loading platform, extending outwardly and westerly from the stock pens toward the house track. About 260 feet south of the stock pens, and extending thence southwardly along the east side of the house track for some distance, there are located several permanent structures, namely, a long shed, or series of coal bins; a grain elevator; an oil building; and a lumber shed. The latter structures (it seems to be so conceded by the parties, and to be supported by the evidence) are located in such close proximity to the house track that a man upon the side of a car cannot pass them in safety. A sign in large letters, placed on the north end of the long shed, or coal bins, gives the warning: "Will not clear man between building and cars."

Plaintiff testified that he knew, at the time of his injury, that all of the aforementioned structures were located on and along the east side of the house track. Plaintiff had made some five or six trips over defendant's line of railroad from Des Moines, Iowa, to Conception, Missouri, through the town of Blockton, counting each way as

a single trip. Upon those several trips over defendant's railroad line, plaintiff had noticed, in a general way, various and different structures and buildings along the line, and had seen several stock chute gates, but none of those gates he had seen were open, and they were fastened back clear of the tracks.

The stock-loading platform, extending outwardly from the stock pens, at Blockton, was made of heavy timbers, and was about as high from the ground as the floor of a railroad stock car, and was used in loading cattle from the stock pens into such cars. Two heavy timber gates swung outwardly, on hinges, from posts attached to the stock pens, across and over the top of the loading platform, and, when opened, served to form a chute or runway, through which cattle were driven from the stock pens across the loading platform and a portable bridge into the cattle cars. When closed, the gates served as a barricade, or fence, confining the cattle within the stock pens. To each of said gates was attached a sliding extension, or arm, which, when pulled out, lengthened each gate so as to reach to the sides of the cattle cars, which cars are of various widths and sizes. One of defendant's witnesses testified that ''no provision had been made for fastening the gates shut.'' It is apparent, however, both from the testimony and from several photographs of the gates and the stock loading platform in evidence, that the gates easily could have been swung inwardly upon their hinges and closed, so as not to extend outwardly over the loading platform, and that it was entirely possible to have kept them closed and fastened, by the use of a simple latch, or other similar devise, so as to be flush, or on the same plane, with the posts to which their hinges were fastened. According to the testimony of one of defendant's witnesses, the distance from the post, on which each gate was hinged, out to the center of the house track was about eleven and one-half feet, and the distance from each post to the side of an average-size car upon the house track was about six feet. Defendant's civil engineer testified: ''The loading platform wouldn't likely clear a man hanging down in the stirrup of a car and holding to the bottom handhold. It depends on what position he is in, of course. . . . If the stock chute gates were closed, or fastened back, and a man were riding at an elevation above the platform, there would be nothing along there at those stock yards that could strike him when he is riding on the side of a car.''

It was admitted into the record on the trial by defendant's counsel that the gates were standing open, and were not fastened, at the time of plaintiff's injury; that the defendant knew they were open, or should have known such fact; and that the gates, when opened out, with the extensions on them, would extend outwardly toward the house track so far that a man on the side of a car could not pass them in safety.

On the day of his injury, the train crew were making a trip northwardly to Des Moines, Iowa, and arrived at Blockton about five o'clock in the afternoon on the main-line track, with a train of twenty or twenty-five cars. The train was cut, and the locomotive engine proceeded with three or four cars past the north end of the passing track, and then backed southwardly in and upon the passing track, and then onto the north end of the house track. Plaintiff, being the head brakeman, threw the switch leading from the main track to the passing track, and after the engine and cars had backed onto the passing track, he then threw the switch leading from the passing track to the house track, giving the necessary signals in each instance to the engine-men from the west side of the string of cars. The engine and cars then backed southwardly to some point near the south end of the house track, which was about 900 feet in length, where several cars were coupled on, and the conductor and the "swing," or middle, brakeman gave a signal to pull northwardly, which signal plaintiff repeated to the engine-men. During the whole of such switching movement, plaintiff was on the west side of the house track and the string of cars. After the train had passed the permanent structures near the south end, and on the east side of, the house track, plaintiff boarded (from the west side) the front or north end of a steel coal car, known as a gondola or "battle-ship" type, with the intention of passing through the train over to the east side thereof, his purpose in so doing being to place himself on the right, or engineer's, side of the train, so as to be in position to signal directly to the engineer instead of to the fireman. Plaintiff crossed over from the west to the east side of the train upon the sill, or beam, on the north end of the gondola car. There was a handhold on the east side of the north end of the car, and there was a ladder, with grab-irons at the top of the ladder, on the east or right side of the car, at the northeast corner. While plaintiff was in the act of moving around the northeast corner of the gondola car, with his back to the north, or front end of the train, and with his face, or vision, to the south, or rear end of the train, he was struck in the back by the open gates of the stock pen and was injured thereby. Plaintiff thus testified as to his position on the car: "As I went crossing over, going between the cars (indicating), I had leaned out with my left hand so it would be on the grab-iron on the outside, and with the right handhold of one on the inside of the end of the car, and had just leaned out like that (indicating), and had no more than leaned out, and I was struck by that gate." Plaintiff was not thrown from the side of the car, but "managed to hang on to the car until the train had been stopped."

The handholds, or grab-irons, extended from the side of the car about three and one-half or four inches, and the "hang-over," or

the distance from the outside of the rail to the outside of the ladder of the car, was about twenty-eight inches. Plaintiff testified that his position, at the time of his injury, was higher than the floor of the gondola car, and that the floor of the gondola car was higher than, and above, the top of the loading platform, but that if he had been upon the stirrup of the gondola car, which stirrup is below the floor of the car, he probably would have been struck by the loading platform, which, however, would have knocked or thrown him from the car.

Plaintiff admitted, on cross-examination, that he did not look forward—i. e., toward the north, or front of the train—but said that "he didn't have time to look" before swinging his body around the northeast corner of the gondola car; that he was watching his feet while getting into position from the north endsill of the car onto the ladder, or grab-irons, on the east side of the car; that he did not look or glance to see what structures, if any, the train was passing at the time; and that, "if he had known the stock pens were there," he could have hesitated momentarily to look.

Plaintiff testified, as his reason, or purpose, in passing through the train so as to be in position to give the signals to the engineer from the east, or right, side of the train, that the engineer had instructed him "to work from his (the engineer's) side as much as possible, on account of the fireman being inexperienced, and he (the fireman) could not take and read signals properly, and transmit them to him (the engineer)." On cross-examination, plaintiff testified that the engineer had told him to give signals from the east side of the train "when it was convenient" to do so, and that he knew that it was not permissible in railroading to work on the side of a track where there were permanent structures. The engineer testified that he had told plaintiff, on the day before his injury, "to work as much as he could on my side of the cars."

All of appellant's assignments of error are directed to the giving of certain instructions to the jury at the request and on behalf of defendant, and over the objections of plaintiff.

I. Defendant's instruction numbered 3, the giving of which is assigned as error, is as follows: "The court instructs you that you cannot find the defendant guilty of any negligence in having *permanent structures* on the east side of its house track, and in such close proximity thereto that persons could not pass the same in safety while riding on the east side of defendant's cars." (Italics ours.)

Appellant contends that such instruction could have had no other purpose or effect than to mislead the jury into believing that de-

fendant was not guilty of negligence in maintaining and permitting its stock pen gates to stand open so they would not clear a brakeman on the side of a car, or in failing to fasten back, or to close, said gates. Unquestionably, we think, appellant's assignment of error directed to the foregoing instruction is well grounded. The word "permanent," used in said instruction, is defined by lexicographers as "fixed; stable" (Webster's Dict.), and, in its usual and ordinary sense and acceptation, implies immovability. That the stock pen gates by which plaintiff was struck were not fixed, stable and immovable structures is amply demonstrated by the testimony and by the photographs of the gates in evidence. They swung on hinges and were not stationary, but were so designed and constructed as to be capable of being closed and fastened, so that, when closed, they served as a fence or side of the stock pen. No charge or specification of negligence was made by plaintiff in his petition against defendant in having or maintaining permanent (i. e. stable and immovable) structures on the east side of its house track, and no such issue was tendered by the petition.

Plaintiff made no contention whatsoever that the defendant was guilty of any negligence in maintaining the fixed, stable and immovable structures and buildings, such as the coal sheds, grain elevator, lumber shed, and oil building, or even the stock-loading platform, in such close proximity to its house track that they would not safely clear a man on the side of a car, nor was any evidence offered by plaintiff that the maintenance of such structures was negligence on the part of defendant. Neither was there the slightest evidence that plaintiff was injured by coming in contact with any of such permanent and immovable structures. There was no such issue in the case, and hence there was no reason for the jury to be instructed thereon. If, therefore, the purpose of the instruction was merely to inform the jury that it was not negligence on the part of the defendant in having, or maintaining, immovable and stationary structures on the east side of its house track, and in such close proximity thereto that persons could not pass the same (i. e., such immovable and stationary structures) in safety while riding on the east side of defendant's cars, then the instruction had no application to any issue in the case, it invited the jury into a field of conjecture and speculation, and therefore constituted reversible error. [Esstman v. Railways Co. (Mo. Sup.), 216 S. W. 526, 528; Felver v. Railway Co., 216 Mo. 195, 209; Chaar v. McLoon (Mo. Sup.), 263 S. W. 174, 176, and cases there cited.]

If, on the other hand, by the use of the words "permanent structures," the instruction had reference to the movable gates, on the theory that the gates themselves were "permanent structures," as seems to be contended by defendant, then such contention is untenable, because all of the evidence tends to show that the gates were movable,

and not fixed, stable and stationary, and that they swung on hinges and were readily capable of being closed and fastened, and were evidently designed for the purpose of being used as a fence or side of the stock pen, when not opened and in use as a stock chute. If the instruction had reference to the gates as "permanent structures," then the instruction was misleading to the jury and was in clear and direct conflict with plaintiff's main instruction on his theory of recovery, which submitted to the jury the issue, raised and joined by the pleadings, "that defendant negligently permitted said gates to be and stand open, and negligently failed to fasten back or to close said gates." In other words, the instruction nullified plaintiff's instruction on his theory of recovery, and the giving of the instruction was tantamount to sustaining a demurrer to plaintiff's case and to peremptorily charging the jury to find for defendant upon the issue of defendant's negligence, by telling the jury, in effect, that the defendant was not guilty of negligence in permitting the gates to remain open and in such close proximity to its house track that a person could not pass the same in safety while riding on the east, or right, side of defendant's cars. That the maintenance of like and similar structures, so as to be in such close proximity to railroad tracks as to endanger persons riding upon railroad cars, constitutes negligence, and that the issue of a defendant's negligence in such instances is properly referable to a jury, has been well and firmly settled by the decisions of our own court and those of the appellate courts of other jurisdictions. [Crawford v. Stockyards Co., 215 Mo. 394; Henderson v. Railroad Co., 100 Neb. 734, 161 N. W. 267; Kiest v. Railway Co. (Iowa), 81 N. W. 181; Railroad Co. v. McDade, 191 U. S. 64; Railway Co. v. Swearingen, 196 U. S. 51.] The facts in the Crawford case, supra, were almost identical with those in the instant case, and this court therein ruled that it was actionable negligence for the defendant to have allowed the gates of its stock pen to remain open so as to swing or stand in close proximity to a railroad track, and that it owed plaintiff, a stockman who was riding on the side of a railroad car, the positive duty to keep the gates of its stock pen closed while the train was passing. In the McDade case, supra, plaintiff's intestate, a railroad brakeman, was struck and killed by the overhanging spout of a water tank while engaged in the discharge of his duties on defendant's railroad train. In affirming a judgment for the wrongful death of the brakeman in that case, the United States Supreme Court said: "Where no necessity exists, as in the present case, for the use of dangerous appliances, and where it is a matter requiring only due skill and care to make the appliances safe, there is no reason why an employee should be subjected to dangers wholly unnecessary to the proper operation of the business of the

employer. [Citing authorities.] . . . It is the duty of a railroad company to use due care to provide a reasonably safe place and safe appliances for the use of workmen in its employ. It is obliged to use ordinary care to provide properly constructed roadbed, structures and track to be used in the operation of the road. [Union Pacific Ry. Co. v. O'Brien, 161 U. S. 451.] The spout might readily have been so constructed and hung as to be safe. As it was maintained it was a constant menace to the lives and limbs of employees whose duties required them, by night and day, to pass the structure. It is a case where the dangerous structure is not justified by the necessity of the situation, and we agree with the judgments in the courts below that its maintenance under the circumstances was negligence upon the part of the railroad company.''

Defendant's instruction numbered 3 was highly prejudicial to plaintiff, and the giving of the same to the jury constituted reversible error for the reasons given.

II. Error is assigned in the giving of defendant's instruction numbered 4, which reads: "You are instructed that if you should  believe from the evidence that, in the duties to be performed by plaintiff at the time he was injured, there was a safe way of performing such duties, and that plaintiff knowingly undertook to perform his duties in a hazardous or more dangerous way, then he was guilty of negligence, and *this fact must be considered* by you *in arriving at your verdict.*'' (Italics ours.)

It will be noticed that the instruction told the jury in unequivocal language that if they believed the fact hypothesized therein to be the true fact, then such fact *must* be considered by them, not in arriving at the *amount* of their verdict, but in arriving at their *verdict*. The word, or term, ''verdict,'' as used in legal phraseology, and in common parlance as well, is understood generally to mean the pronouncement, finding and determination of a jury upon an issue of fact as between two opposing and contending parties. The effect of the instruction, in our opinion, was to lead the jury to believe that if they found plaintiff guilty of negligence in knowingly undertaking to perform his duties in a hazardous or more dangerous way, when there was a safe way of performing such duties, they must consider that fact in reaching their ultimate finding as between the one or the other of the two opposing and contending parties, i.. e., whether for the plaintiff, or whether for the defendant. The performance, by plaintiff, of his duties in a hazardous or more dangerous way, when there was a safe way of performing such duties, at most amounted to only contributory negligence on his part, and the plain language

of the Federal Employers' Liability Act (Sec. 8659, U. S. Comp. Stat.) is to the effect that while contributory negligence of the railroad employee may be shown, such contributory negligence on the employee's part does not preclude or bar a recovery, or constitute a complete defense in favor of the defendant railroad employer, but is to be considered by the jury only in diminution of the damages recoverable by the railroad employee from the railroad employer. An instruction given on behalf of plaintiff rightly told the jury that if they found the general issue for the plaintiff and they believed and found from the evidence that plaintiff was guilty of negligence that directly contributed to cause his injuries, if any, then they should diminish the amount of his damages, if any, in proportion to the amount of such negligence, if any, attributable to plaintiff. A similar instruction was given on behalf of defendant. Had defendant's instruction numbered 4 told the jury that the fact hypothesized therein amounted to contributory negligence on plaintiff's part, or amounted to negligence that directly contributed to cause his injuries, and, therefore, that such fact must be considered by them in arriving at the amount of plaintiff's damages, as stated in other instructions given them, the instruction, perhaps, would not have been misleading or confusing to the jury. In the form, however, in which the instruction was given it was certainly misleading and confusing to the jury, to say the least, and was seemingly in conflict with other instructions given to them, defining contributory negligence and the extent and effect of such contributory negligence as bearing upon the amount of damages recoverable by plaintiff, notwithstanding his contributory negligence, if any there be. We believe the defendant's instruction numbered 4 was prejudicial to plaintiff, and that the giving thereof constitutes reversible error.

III. Error is assigned in the giving of defendant's instruction numbered 7 with reference to the credibility of witnesses, which told the jury that, if they believed that any witness had wilfully sworn falsely to any material fact in issue, they might disregard the whole or any part of such witness's testimony. That assignment must be ruled against the appellant. The same, or like, form of instruction has been held, in recent decisions of this court, not to amount to reversible error. [Malone v. Franke, 274 S. W. 369, 373; Esstman v. Railways Co., 232 S. W. 725, 728; Wright v. Kansas City, 187 Mo. 678, 695.] In the Esstman case, supra, we said: "This is the usual instruction upon the credibility of witnesses. In form it is hoary-headed with age in our case law. . . . From the beginning to this hour, the circuit judges of this State have given an instruction substantially in this form."

Criticism is made against another of defendant's instructions, but inasmuch as the judgment must be reversed and the cause remanded because of error in the giving of defendant's instructions numbered 3 and 4, and as the criticised instruction may not be requested or given on a retrial of the cause, we deem it unnecessary to prolong this opinion by a discussion of that instruction.

The judgment *nisi* must be reversed and the cause remanded, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by Seddon, C., is adopted as the opinion of the court. All of the judges concur.