## UNITED STATES COAL CO. v. PINKERTON et al.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1909.)

No. 1,869.

1. TRIAL (§ 280*)—EXCEPTIONS—INSTRUCTIONS—ASSUMED FACTS.

An exception to so much of a paragraph of the charge as assumed a certain state of facts was defective as too broad, where it did not except to any particular fact but to a collection of facts, and failed to call attention to any explanation or additional fact.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 691, 692; Dec. Dig. § 280.*]

2. TRIAL (§ 192*)—INSTRUCTIONS—ASSUMED FACTS.

A federal court in its charge may assume facts which have been well established.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 432; Dec. Dig. § 192.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MASTER AND SERVANT (§ 80*)—CONTRACT OF EMPLOYMENT—EVIDENCE.

Evidence *held* to warrant a finding that plaintiff understood that its services were being rendered for and on the credit of defendant company, and not for an indefinite committee of coal operators who were each to contribute a proportionate share.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 118; Dec. Dig. § 80.*]

4. MASTER AND SERVANT (§ 7*)—CONTRACT OF EMPLOYMENT—MODIFICATION—MEETING OF MINDS.

Where plaintiff originally contracted for the rendition of services and the making of disbursements for defendant company, there could be no subsequent modification of such contract, substituting for complainant a committee of coal operators who had agreed to contribute pro rata to the expense of plaintiff's employment, without a meeting of minds.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 7; Dec. Dig. § 7.*]

In Error to the Circuit Court of the United States for the Northern District of Ohio.

F. A. Quail, for plaintiff in error.

W. B. Sanders, for defendants in error.

Before LURTON and WARRINGTON, Circuit Judges, and KNAPPEN, District Judge.

LURTON, Circuit Judge. This was an action to recover a balance of $10,038.87, claimed to be due to the defendants in error, who did business as the Pinkerton National Detective Agency, by the United States Coal Company, a coal mining corporation of the state of Ohio, for services rendered and money advanced at its instance and request. The defense was that the coal company was not the debtor, but that the Pinkerton Agency advanced the money and rendered the services mentioned at the instance of a committee composed of representatives of a number of coal mining companies, and that the coal company sued did not assume or promise to pay the expenses incurred under that employment.

That the issue may be better understood, it is essential to state certain facts: In the spring of 1906, there was a strike among the union coal miners employed in the Ohio coal fields, and as a consequence nearly all of the Ohio mines were compelled to suspend operations. To break this strike was deemed necessary, and for this purpose a large number of coal operators arranged for concerted action through a committee of representatives. There was evidence tending to show that this committee was authorized to select some one mine and operate it at the common expense, through the aid of nonunion miners procured and protected by the detective agency operated by the Pinkertons. One of the mines owned by the United States Coal Company, known as the "Plum Run Mine," was selected as best situated for the experiment, and there was evidence tending to show that the general manager of that coal company was requested and authorized to arrange with the Pinkerton Agency for the men and the guards necessary to operate that mine. The general manager of that company was one H. E. Willard, who had long been acting in that capacity.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

That the services of the Pinkerton Agency were secured by Mr. Willard, and that all of such services and advances were directly in connection with the operation of the Plum Run mine owned by the United States Coal Company, and at the sole instance and request of Mr. Willard, was shown beyond dispute. Day by day reports were made to Mr. Willard, and all accounts for services and expenditures were rendered to the United States Coal Company. Upon an account so rendered to that company, a payment was made by its own check of $6,000, though it is shown that this was made out of money supplied to it by the associated operators.

The claim of the plaintiffs below was that they rendered these services to the United States Coal Company and upon the property of that company, and at the instance and request of its general manager. The insistence of the defendant below was that, although such services and advances were apparently made upon and about its coal mine, and at the instance of Mr. Willard, its general manager, in truth and fact Mr. Willard was not in that matter acting as its general manager, but under the direction and authority of the committee of co-operating mining companies, and that, although the services and expenditures were apparently rendered to it and upon its property, in fact its said mine was being operated at the expense of the co-operating companies, each of whom expected to benefit by the moral effect of a successful operation of that mine by nonunion strike breakers, under the protection of the Pinkerton Detective Agency. That the men hired by the Pinkertons were carried on the payroll of that company exclusively is not disputed. But it is said that the expense of procuring them and of guarding them against the attack of the strikers was an expense which was to be borne pro rata by the co-operating companies.

The question is whether there was any agreement that the defendants in error should look to these co-operating companies for their bill as joint contractors, or whether they may look to the United States Coal Company as paymaster, without regard to any arrangement by which other companies might divide the expenses between them. As the case turns upon this, we set out the more material part of the evidence of H. E. Willard, the general manager of the business of the United States Coal Company, and the witness upon whose evidence the plaintiff in error must rely to escape liability.

After referring to the very extensive strike of coal miners, affecting nearly every mine in Ohio, he tells of several interviews with Mr. Frank J. Heine, the superintendent of the Pinkerton Detective Agency. After stating his relations to the plaintiff in error, he says that about May 8th he sent for Mr. Heine and had a conference with him in the office of the United States Coal Company in Cleveland. In this first interview he testifies that he told Heine:

"'I would like to get his prices and terms for the employment of the members of their agency, and to consult with him relative to the opening a mine for the operators of Ohio, and his terms and prices.'

"There wasn't much discussion of details. He gave me the price at which we could hire his operatives," etc.

Asked what he said of the coal miners' strike and its extent, he replied:

"I said to him in a general way that the operators of Ohio were giving the matter consideration to operate mines or a mine, and that they had instructed me to interview different people relative to bringing about a state of affairs of that kind."

He also told him that he had just returned from a meeting of operators at Columbus, and was to have another on May 11th, but "did not say much to him, except that there had been a meeting at Columbus."

Referring to a later meeting, which he says occurred on the 11th of May, he says he told him that he "had submitted his terms and price to the committee of fourteen and other gentlemen who were interested in this project, and they had authorized me to employ the Pinkerton Agency," and that arrangements had been so far concluded at that meeting that we would go ahead with the project.

Other evidence shows that on the 12th he again saw Heine. What passed between them, he does not say, further than that Heine said:

"He would open an office over here at 236 Superior street for the employment of guards, and would get their men in various parts of the country looking out to get men that might be available to act as miners, and to get them transported."

In accordance with the arrangements thus concluded, not later than the 12th of May, the defendants in error's services were at the command of Willard, and men and guards began, as a result of the activity of the agency, to arrive at the mines of the plaintiff in error on the 16th of May. Up to this time there had been nothing to indicate to Heine that he was to look to any other principal than the company whose mine was to be opened and operated through the service of his agency. Certainly there had been no indication of the names of any other principals, no definite statement that any other companies were to bear or share in the expense of operating a mine which was the exclusive property of the plaintiff in error. From other, but uncontradicted, evidence, it is shown that Heine was then directed to report daily to Willard and to send the bills to the plaintiff in error.

Willard's evidence of the occurrence prior to May 18th, aside from the conflicting evidence of Heine and others who testified about these negotiations, shows contract, made under circumstances which in law imply the promise of the United States Coal Company to pay the expense which the defendants in error were induced to incur, at the request of its general manager, upon and about its exclusive property. If there was any modification of this implied obligation, any substitution of an agreement to look to the "coal operators of Ohio," or to any unnamed committee representing that numerous body of independent companies, partnerships, and individuals, it must have occurred after defendants in error had rendered much service and incurred much expense under the original agreement shown by the evidence to which we have already referred. The first disclosure to the agent of the defendants in error of even the names of this mysterious committee of 14, or of any plan of that committee for sharing in the expense of operating the private mine of the plaintiff in error, occurs in the evidence of Willard and of Heine as to a meeting which occurred either on May 17th or 18th. As to that meeting Willard tes-

tified that he told Heine that there had been on that day a meeting of the operators' committee, and that the plans suggested by him, Heine, had been approved, as well as the contract which they had agreed upon at the earlier interview. He then says that Mr. Heine said that the expense was going to be very heavy, and that he wished to know, "who is in this thing"? He continues as follows:

"I told him that the state of Ohio, and the United States Coal Company included with the rest. When I speak of the state of Ohio, I mean the operators owning mines in the state of Ohio. And that they had held a meeting at Columbus, and had appointed a committee of fourteen; the committee of fourteen had authorized me to act as their agent, and to operate for them our Plum Run mine; that I had made such arrangements with the committee of fourteen and other gentlemen as completely satisfied me that the money would be forthcoming, and that I would see that he got his money.

"Q. Were those arrangements made at the meeting you have mentioned? A. Yes, sir. Q. And you told him what on the subject of money being raised? A. That all of the operators who had entered into this agreement would pay pro rata amount on the amount of coal produced in their mines; that a levy had been made at this meeting; and that the United States Coal Company would pay its pro rata share with the rest. Q. What did he say about that? A. Mr. Heine said at that time that his bill would probably, before we got through with it, amount to considerable money; that he did not believe that the optimistic views that the operators had of getting through with it in two or three weeks would be realized; he thought it would take longer; and he wanted to know what men of large ability were behind the thing, so that when the bills come due they would be paid. Q. What did you say on that subject to him? A. I named to him men that were interested in the project. Q. What names did you mention? A. I told him Mr. Winder, and named to him all the members of the committee of fourteen, and, in addition to that, some local coal operators. Q. Give the names you gave him? A. I told him Mr. Winder, Mr. Chapman, Mr. Cunningham, Mr. Zerbe, Mr. Hornicle, Mr. Osborn, Mr. Roby, Mr. Newell. Q. Do you recall all the names that you did give him? A. No; I had them all fresh in my mind at that time. There were other gentlemen who were members of the committee of fourteen that have escaped my mind; I know their residence and the mines they operate, but I don't just recall their names at this minute. Q. Did you know them then? A. Yes, sir. Q. When you gave him those names, what did he say? A. I don't remember just what he said—just the words he replied in. Q. Not the words; the substance of it? A. The substance was that apparently—I supposed—that he thought it was all right. (Objection.) He seemed satisfied. (Objection by counsel for plaintiffs.) The Court: Tell what he said, or the substance of it. Q. Did he say anything at that time, or did you say anything, about the United States Coal Company paying all this expense? Did you say that the United States Coal Company would bear all the expense and pay all their bills? A. No. Q. Did you say that at the earlier talk? A. No. Q. Did he say that he wanted them to? A. No. Q. Did he say that at any time? A. Not that I remember of."

We do not find any substantial evidence that Heine was informed prior to this interview of any arrangement between the numerous coal operating companies, supposed to be represented by a committee, by which these companies were to share upon some pro rata basis the expense of operating the Plum Run mine of the plaintiff in error. But assuming that something was said, or that such a sharing might be inferred, that knowledge would not release the plaintiff in error from their implied obligation to defendants in error, in the absence of an agreement that they would look to such other principals for their bills, and not look to the United States Coal Company except as one of the contributors.

Upon this subject, the court rightly said to the jury:

"If it should be a fact, as shown by the testimony, that other persons or companies were to divide among themselves pro rata the expense of operating the defendant's mine, and if it be a fact that the plaintiffs' manager here knew that, that would not change the contract relations between the parties, nor would it release the defendant from its own direct responsibility to the plaintiffs for the amount of their claim, unless the plaintiffs agreed to look to those other parties, whoever they might be, and not look to the defendant."

Pursuing the same idea, he further said:

"The arrangement for these services was made with the defendant's general manager. The work was done upon and the money expended about, and in relation to, the property of the defendant and in connection with the work that was to be prosecuted on the defendant's property. The negotiations were conducted with the defendant's general manager and at the defendant's office, and the bills were rendered to the defendant. Now, these circumstances I have marshaled for the purpose of laying down a general rule of law which is applicable to them, and that is this: That if, under all the circumstances of this case, as they appear to you in the evidence, you cannot find that there was a meeting of the minds of the parties who made this contract as to the particular persons or individuals who were to be liable; that is, if it should be your opinion that the plaintiffs in good faith thought, when the employment was entered into that the coal company was primarily liable, while on the other hand, Mr. Willard thought and intended that the operators together were to be primarily liable, and that the defendant was to be liable only for its pro rata share of the expense—then I say to you that since these services were thus performed and these moneys paid out at the prime instance of the defendant, and under the circumstances which I have stated at the beginning of this particular observation, then I say to you that the plaintiffs are entitled to recover."

The plaintiffs in error excepted to so much of the paragraph last set out as assumes a certain state of fact, and have assigned error upon it. This exception was not to any particular fact, but to the collection of facts. Neither was attention called to any explanation or additional fact. The assignment is bad as too broad. There is no dispute but that many of the facts which the court assumed to be the facts of the case were properly so assumed. Indeed, we do not think it assumed any fact which was not well established.

There was no error in the rule of law applied to the facts assumed. Indeed, the court might have told the jury that on May 11th or 12th the parties to this suit had come to an agreement for the service of the defendants in error, and that there was nothing in the contract under which the employment of the defendants in error began from which it might be inferred that the defendants in error agreed then to look to any principal for their payment other than the United States Coal Company. Undoubtedly, it was competent for the parties to thereafter substitute for the implied obligation of the plaintiff in error another agreement by which the defendants in error should look to other principals. If such modification of the original implied obligation of plaintiffs in error occurred at all, it must have occurred on May 17th or 18th, when Willard says he disclosed to Heine the names of the men comprising the co-operating coal mining companies' committee. The evidence upon which a change of obligors must be predicated is that above set out. From that evidence, considered apart from the contradicting testimony, it could not be reasonably said that the defendants in error assented to any arrangement by which they were to look to

the plaintiff in error for only a pro rata of the expense and to this committee of the operators for the rest. Everything said by Willard to Heine, both before and after May 17th, is consistent with the idea that the co-operating coal companies were, as between themselves, to share the cost of operating the mine, but that the United States Coal Company was to pay the Pinkerton bills and reimburse itself according to its arrangement with its backers. But it is enough to say that there is no sufficient evidence of a meeting of minds by which the liability of a large committee was to be substituted for the liability of the company requiring the service and directly receiving the benefit. A meeting of minds to change or modify a contract or introduce a new term is as essential as it is to the completion of the original agreement. It is not enough to show that one party in good faith understood that a different arrangement was made from that which by implication of fact and law existed. It must be shown that the other party assented to the same subject-matter. As there can be no contract without the assent of both parties, so there can be no modification or substitution of a new arrangement for the original without such mutuality of assent. Utley v. Donaldson, 94 U. S. 29, 45, 47, 49, 24 L. Ed. 54; Mildleberger v. Baldwin, 2 Hall, 196; Darnley v. The Proprietors, 2 L. R. H. L. 43, 60, N. G. S. C.; Burton v. Rosemary Mfg. Co., 132 N. C. 17, 43 S. E. 480; Russell v. Clough, 71 N. H. 177, 51 Atl. 632, 93 Am. St. Rep. 507; Turner v. Webster, 24 Kan. 38, 36 Am. Rep. 251.

The case of Mildleberger v. Baldwin, cited above, is cited with approval by Justice Swayne in Utley v. Donaldson, cited above; the facts and the rule applied being thus epitomized by the court:

"The defendant bought merchandise of the plaintiff, and it was agreed that it should be paid for by the note of a third person payable to the defendant, to be by him indorsed to the plaintiff. After the goods were delivered the note was tendered, indorsed without recourse. The plaintiff refused to receive it, insisting that the agreement was that the note should be indorsed without this qualification, and thereupon brought the suit. The court left it to the jury to find whether there was a misunderstanding between the parties as to the manner of the indorsement. The jury so found; and it was held that the plaintiff was entitled to recover as if there had been nothing said about the note, there being no assent of the two minds as was necessary to make a contract in relation to it."

It has been assigned as error that the court treated the whole claim as depending upon the same question. There was evidence tending to show that some of the operators settled their strike some time in June and withdrew from the arrangement under which they were to share the expense of operating the Plum Run mine, and that other operators then entered into the plan for continuing the operation of that mine, the expense to be shared by the new combination. There was evidence that defendants in error were told of this change and asked to separate their account, so as to distinguish between the expense before and after June 20th. But there is no shadow of evidence that the defendants in error ever were asked or agreed to look to these new operators as their principal, or to any change in the original implied agreement of the plaintiff in error to meet their bills. The case for an agreed modification on June 20th is even weaker than that for a new arrangement on May 17th or 18th. The court was not asked to

give any special charge relating to this change in the operating committee, and there was no error in treating the claim as a unit. The court would not have erred by a peremptory instruction for the defendants in error.

The assignments are overruled, and the judgment affirmed.