TERMINAL R. ASS'N OF ST. LOUIS
v. FITZJOHN.

No. 13580.

Circuit Court of Appeals, Eighth Circuit.

Jan. 7, 1948.

As Modified on Denial of Rehearing
Feb. 17, 1948.

Arnot L. Sheppard, of St. Louis, Mo. (George P. Mueller, of St. Louis, Mo., on the brief), for appellant.

Roberts P. Elam, of St. Louis, Mo. (Joseph B. McGlynn, of E. St. Louis, Ill., on the brief), for appellee.

Before SANBORN, WOODROUGH, and COLLET, Circuit Judges.

COLLET, Circuit Judge.

In an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., the plaintiff recovered a judgment for personal injuries. From that judgment this appeal is prosecuted. The parties will be referred to as they were designated in the trial court.

Plaintiff was seriously injured on the night of June 10, 1943, while he was in the performance of his duties as foreman of a switch crew engaged in switching railroad cars at the Ordnance Plant operated by the United States Government near St. Louis, Missouri. The accident occurred about 9:20 P. M. The switch engine had coupled to a string of fourteen cars standing on a sidetrack which was parallel and adjacent to a loading ramp preparatory to pulling the cars away from the ramp. The side of the ramp next to the track upon which the cars were standing consisted of a concrete wall. In this wall had been placed several iron pipes or standards on the top of which electric lights were mounted. These standards were only about six inches from the side of a box car standing on or moving along the adjacent track. It is conceded by all that the clearance between the side of a box car on this track and these standards was wholly inadequate to permit a person riding on the side ladder of the box car to pass the standards without being knocked off or crushed between the side of the car and one of the standards. On the night of the accident plaintiff had walked along the top of the ramp from the engine to the end of the string of cars to see that no one was in the cars before they were moved. He then gave the signal with his lantern for the engine to pull the cars out and immediately started to climb up the side ladder near the end of the last car from the engine to get on top to supervise

from there the remainder of the movement. He had nearly reached the top of the car when he was knocked off by one of the standards and, as stated, severely injured. The negligence charged was failure on the part of defendant to exercise reasonable care to furnish plaintiff a reasonably safe place in which to work. The defenses relied on at the trial and here are that plaintiff was a "lent servant" to the United States at the time of his injury, working upon premises owned and controlled by the United States and hence defendant owed him no obligation concerning the safety of the premises in question. It was and is further contended that plaintiff's injuries resulted entirely from his own negligence.

On the question of whether plaintiff was the servant of defendant or the United States at the time of his injury the facts are substantially undisputed. It appears from the record that the defendant operates two main line tracks north and south between the "Warehouse" portion of the Ordnance Plant on the west of the tracks and the Motor Pool section of the Ordnance Plant on the east. Both sections of the Plant were enclosed by fences. Several switch tracks had been constructed and were being maintained by the Government within the plant. These switch tracks were owned by the Government, as was everything else in the plant including the ramp mentioned above. The switches were connected with the defendant's main line tracks and it was impossible to move cars from the Warehouse Section to the Motor Pool or vice versa without passing over the defendant's main line tracks. From about the time of the establishment of the plant until April 5, 1943, defendant had been sending an engine and switch crew from its Carrie Avenue Yard into the plant to do all the necessary switching. There was no charge made for the original placing of cars or taking loaded cars out, but for each additional movement of cars within the Plant a charge of $3.47 was made. This arrangement was not satisfactory to the plant officials since it frequently occurred that the defendant's engine and crew would not be in the plant when needed and much time would be lost in waiting

for it to come from defendant's yard. In addition to the inconvenience, the expense of $3.47 for each movement within the yard was considered undesirable. The Commanding Officer and the Transportation Officer of the plant worked out an arrangement with defendant and the Railroad Brotherhoods for both inter and intra plant switching by which the Government furnished a light switch engine which remained in the plant available at all times for switching in the plant and the movement of empty and loaded cars to and from the plant and defendant's yards. The defendant furnished the crew to man the engine. This crew was carried on the defendant's pay roll and paid by it. The members of the crew belonged to the Brotherhood which had the usual union contract with the defendant. By that contract no one other than an employee of the defendant could operate equipment on defendant's tracks. The switch crew reported for work at the plant each day the plant operated. At the beginning of each day's work the crew got instructions from the plant officials as to what cars were to be moved. During the day frequently plant employees directed the crew to move cars from one place to another in the plant. When it was necessary to go from one section of the plant to the other, necessitating the use of the defendant's main line tracks the crew was required to get permission from the defendant's yard before using the main line tracks. A telephone was installed in the plant connected with the defendant's yard office for that purpose. On Sundays and other days when the plant was not in operation the members of the switch crew were required to report to work at the defendant's yard for assignment to other work by defendant. If they did not report for work or ask for a "lay off" they were treated as discharged. When the arrangement by which the Government furnished the switch engine was put into effect on April 5, 1943, defendant "posted" that job on its bulletin board. That "posting" amounted to a notice to its employees that this job or assignment was open to be "bid in" or chosen by the employees requesting it who had the highest seniority. Plaintiff was one

of the successful bidders for a place on the switch crew. It was generally understood that all employees who might be assigned to this job would have all their rights and benefits as employees of defendant preserved. The switch crew were subject to the rules and working conditions applicable to defendant's other employees. At the end of each day each member of the crew turned in his time to a clerk at the plant. The plant then turned the crew's time cards in to the defendant and, as heretofore stated, defendant paid the crew in the same manner as they had been paid prior to April 5, 1943. At regular intervals the Government paid defendant the amount of wages defendant had paid the crew plus 3% thereof to cover Railroad Unemployment Insurance, 3¼% for Carriers Taxing Act charges (pension) and 10% for accounting. The defendant admitted in its answer that plaintiff was in its general employment but asserted that he was in the special service of the United States and under the "lent servant" doctrine was not a servant of defendant at the time of his injury. The testimony of plaintiff that at no time was he ever advised that there had been any change in the nature of his employment by defendant from that which existed prior to April 5, 1943, and that he had never agreed to any such change, was not disputed. There was testimony by defendant's General Superintendent, likewise undisputed, that during the preliminary discussion preceding the arrangement of April 5th, the plant officials stated that they must have complete authority over the switching crew. There is no intimation in the record that plaintiff knew anything about that other than such inferences as he may have drawn from the actual practice followed in the giving of daily instructions by plant officials in carrying out the switching work in the plant.

■ On the foregoing state of facts the Trial Court instructed the jury that plaintiff was an employee of defendant within the meaning of that term as used in the Federal Employers' Liability Act. We find no error therein. The simple analysis of the arrangement under which defendant was operating at the time of plaintiff's injury is that the plant officials furnished the switch engine and paid the wages of the switch crew in lieu of paying the $3.47 charge for car movements and in order to obtain the advantage of constant availability of the crew. The conduct of the plant officials in directing the crew was the conduct which would necessarily be followed in any industry requiring switching by any railroad. For in no other way could the railroad's employees know what cars to move or where to move them. The switching of the cars by defendant's switch crew within the plant was preparatory to the line haul of the loaded cars by the defendant and connecting carriers. We think the variation from the usual practice of this work being done with defendant's own motive power, resorted to in this instance for the convenience of the government, did not, so far as plaintiff was concerned, make the work of doing the switching any less the work of the defendant than it was before the arrangement was made. Under the rule laid down in Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, cited by both plaintiff and defendant, and other authorities cited, particularly the case of Marion Steam Shovel Co. v. Bertino, 8 Cir., 82 F.2d 541, which reiterate or emphasize various facets of the principle announced in the Anderson case, the work which the plaintiff was doing at the time he was injured was being done by him as an employee of the defendant under its arrangement with those in charge of the Ordnance Plant. This arrangement, as we view it, contemplated no change in the employment status of the plaintiff or of other members of the switching crew and no deprivation of any of their rights or benefits as employees of the defendant. It would be unrealistic to rule that because plaintiff took this job offered to him by the defendant and available to none but one of its employees, he thereby consented to or acquiesced in a change of masters and, in effect, waived the rights accorded him by the Federal Employers' Liability Act.

■ Since plaintiff was an employee of defendant at the time of his injury the fact that the premises where plaintiff was sent to work did not belong to and were not under the control of defendant did not absolve defendant from liability for their

unsafe condition. In Albert Miller & Co. v. Wilkins, 7 Cir., 209 F. 582, 584, the Court stated the rule in the following language:

"That a master is bound to use reasonable care to provide a safe place in which his servant may work is now too well established to require citation of authority, and it can make no difference, so far as the servant is concerned, whether the master is using his own property or that of another. As was said in American Machinery Co. v. Ferry, 141 Ky. [372], page 374, 132 S.W. [546], page 547:

" 'The master who contracts to do work on the premises of another must exercise ordinary care for the safety of his servants there, no less than on his own premises.' "

See also Labatt, Master & Servant (2d Ed.), Vol. 3, Chap. XLV, Sec. 1073, pp. 2835–2836, Grand Trunk R. Co. v. Tennant, 1 Cir., 66 F. 922.

■ It is contended by defendant "that if the evidence does not prove as a matter of law that defendant lent plaintiff to the United States, the evidence does not as a matter of law establish the contrary, and therefore the Trial Court erred in charging the jury as a matter of law that the lent servant doctrine was not applicable."

The difficulty with defendant's position is that there was no substantial dispute about the facts and the Court in applying the law to those facts could permit of no other conclusion than that plaintiff was the employee of defendant. It is not necessary under those circumstances to submit to a jury issues of fact about which there is no real dispute. Federal Savings & Loan Ins. Corp. v. Kearney Trust Co., 8 Cir., 151 F.2d 720; United States Coal Co. v. Pinkerton, 6 Cir., 169 F. 536; Toledo, St. L. & W. R. Co. v. Kountz, 6 Cir., 168 F. 832.

■ Defendant predicates error on the action of the Trial Court in refusing to direct a verdict in its favor on the ground "that plaintiff's injury was the direct or proximate result of his own sole negligence." On the question of whether plaintiff's negligence in using the ladder on the side of the box car was the sole cause of his injury the record discloses the following facts.

Plaintiff testified positively that the portion of the ramp where he boarded the car was dark. He said that there was no light burning in that immediate vicinity. One of defendant's witnesses testified that some of the lights on these standards did not work. The witness was working about twenty feet from the light standard which struck plaintiff. He stated that he could not remember whether the light on that standard was burning but that one of them on the ramp was or they could not have seen to work there. Another of defendant's witnesses who was about a half-block away from the scene of the accident testified that he saw plaintiff knocked from the side of the car and that the light on the standard which struck plaintiff was burning. Plaintiff says that when the engine pulled in to couple on to the string of cars it was his duty to see that there was no one in the way before the coupling was made and the cars moved. Since it was dark and he could not see whether everyone was out of the way he walked down the ramp to the end of the cars and finding everything clear gave the signal with his lantern to pull out. As the cars started to move out he started to climb up on top of the last car so that he could better see what was on the main line. Other witnesses testified that it was customary for the switchman to climb up on top of cars as they were pulled away from the ramp. These box cars were thirteen or fourteen feet high. The top of the ramp was the height of the floor of a box car. He would therefore have had to climb some eight or nine feet from the level of the ramp to the top of the car. As he was in the act of swinging onto the top of the car he was knocked off. He did not see what struck him. He had worked in the plant about two months and knew the light standards were there and that there was insufficient clearance between them and the side of a box car. There was a ladder on the end of the car. When asked on cross-examination whether he had intended to climb the ladder on the side of the car he answered, "yes." In answer to the question—"You didn't intend to climb the

ladder on the end of the car?" he said: "I didn't give it a thought. Like we do anything automatically after we have done it for years, just intended to·climb on." Plaintiff was fifty-seven years old and had been in the employ of defendant twenty-four years. He of course knew of the existence of the ladder on the end of the car. Defendant places much emphasis upon plaintiff's failure to use the end ladder in its argument that his negligence was the sole cause of the injury. The natural thing for plaintiff to do if the light standards had not been there was for him to climb the side ladder which was closest to the ramp rather than reach around the corner of the car and climb the ladder on the end. Assuming that this natural, impulsive act on his part was negligence, was it the sole cause of his injury? That question was submitted to the jury in terse, unqualified language. Under proper instructions the jury found that defendant had not exercised reasonable care to furnish plaintiff a reasonably safe place in which to work. The jury decided both questions against defendant. It is not the function of a Court to set aside a jury's verdict merely because the jury could have drawn a different inference or conclusion from the facts, or because Judges feel that another conclusion would have been more reasonable. Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. We may not set aside the verdict of the jury unless there is no reasonable basis in fact for its conclusion that defendant's negligence in sending plaintiff into an unsafe place was a contributing cause to the accident. The diligence of counsel in citing many cases bearing on this question is of great assistance.[1] An analysis of each would, however, serve no purpose other than to demonstrate the correctness of the preceding rules of law which are indeed not really disputed. This Court, on this record, is asked to say that there was no reasonable basis in the facts presented, for the jury's conclusion. This we cannot do. Plaintiff's negligence was, no doubt, a concurrent cause. But it cannot properly be said to have been the sole cause.

---

[1] Chicago, St. P., M. & O.·R. Co. v. Arnold, 8 Cir., 160 F.2d 1002; McGivern v. Northern Pacific R. Co., 8 Cir., 132 F.2d 213; Morris v. Pryor, 272 Mo. 350, 198 S.W. 817; Baltimore & O. R. Co. v. Newell, 3 Cir., 196 F. 866; Lehigh Valley R. Co. v. Passinier, 3 Cir., 4 F.2d 46; Atlantic Coast Line R. Co. v. Davis, 279 U.S. 34, 49 S.Ct. 210, 73 L.Ed. 601; Ford v. Dickinson, 280 Mo. 206, 217 S.W. 294; Haring v. Great Northern R. Co., 137 Wis. 367, 119 N.W. 325; Texas & P. R. Co. v. Swearingen, 196 U.S. 51, 61, 62, 25 S.Ct. 164, 49 L.Ed. 382; Washington R. & Elec. Co. v. Scala, 244 U.S. 630, 640, 37 S.Ct. 654, 61 L.Ed. 1360; Choctaw, O. & G. R. Co. v. McDade, 191 U.S. 64, 66, 67, 24 S.Ct. 24, 48 L.Ed. 96; Kanawha & M. R. Co. v. Kerse, 239 U.S. 576, 579, 36 S.Ct. 174, 60 L.Ed. 448; Norfolk & W. R. Co. v. Beckett, 4 Cir., 163 F. 479; Harvey v. Texas & Pac. R. Co., 5 Cir., 166 F. 385; West v. Chicago, B. & Q. R. Co., 7 Cir., 179 F. 801; St. Louis, I. M. & S. R. Co. v. Conley, 8 Cir., 187 F. 959; Portland Terminal Co. v. Jarvis, 1 Cir., 227 F. 8; Taber v. Davis, 2 Cir., 280 F. 612; Gray v. Davis, 1 Cir., 294 F. 57; and on second appeal, Davis v. Gray, 1 Cir., 8 F.2d 843; Central of Georgia R. Co. v. Davis, 5 Cir., 7 F.2d 269; Southern R. Co. v. Hobbs, 4 Cir., 35 F.2d 298; Devine v. Delano, 272 Ill. 166, 111 N.E. 742, Ann.Cas.1918A, 689; Illinois Terminal R. Co. v. Thompson, 210 Ill. 226, 71 N.E. 328; South Side Elevated R. Co. v. Nesvig, 214 Ill. 463, 73 N.E. 749; Wallingford v. Terminal R. Ass'n, 337 Mo. 1147, 88 S.W.2d 361; Westover v. Wabash R. Co., Mo.Sup., 6 S.W.2d 843; Howser v. Chicago, Great Western R. Co., 319 Mo. 1015, 1016, 5 S.W.2d 59; McIntyre v. St. Louis-S. F. R. Co., 286 Mo. 234, 227 S.W. 1047; Brown v. Missouri, K. & T. R. Co., 201 Mo.App. 316, 212 S.W. 26; Houston & T. C. R. Co. v. Robins, Tex.Civ.App., 23 S.W.2d 461; Long v. Payne, 198 App. Div. 667, 190 N.Y.S. 803; Henderson v. Union Pac. R. Co., 100 Neb. 734, 161 N.W. 267; certiorari denied 243 U.S. 654, 37 S.Ct. 480, 61 L.Ed. 948; Sprickerhoff v. Baltimore & O. R. Co., 323 Ill. App. 340, 346, 55 N.E.2d 532; 45 U.S. C.A. Secs. 51, 53; Union Pacific R. Co. v. Hadley, 246 U.S. 330, 333, 38 S.Ct. 318, 62 L.Ed. 751; Spokane & I. E. R. Co. v. Campbell, 241 U.S. 497, 509, 510, 36 S.Ct. 683, 60 L.Ed. 1125; Rocco v. Lehigh Valley R. Co., 288 U.S. 275, 280, 53 S.Ct. 343, 77 L.Ed. 743; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 67, 63 S.Ct. 444, 451, 87 L. Ed. 610, 617.

Union Pacific R. Co. v. Hadley, 246 U.S. 330, 38 S.Ct. 318, 62 L.Ed. 751; Rocco v. Lehigh Valley R. Co., 288 U.S. 275, 53 S. Ct. 343, 77 L.Ed. 743.

■ As bearing upon the question of the control which the United States was exercising over the switch crew at the time of plaintiff's injury defendant offered a memorandum between a plant employee and the Plant Transportation Officer dated January 9, 1945, approximately eighteen months after plaintiff's injury, calling attention to a dereliction of the switch crew in carrying out the writer's instructions.[2] It was excluded. Defendant assigns error therefor. The exhibit was apparently excluded for the reason that it referred to an issue which was not in dispute i. e. that plant officials gave instructions to the switch crew relative to the handling of cars in the plant. There was no dispute about that, consequently the action of the Trial Court was not reversible error. Davis v. New York Life Ins. Co., 8 Cir., 47 F.2d 1051; Proechel v. United States, 8 Cir., 59 F.2d 648.

■ Defendant complains of the action of the Trial Court in excluding two notices set out in the margin.[3] While the materiality and competency of these exhibits may be questionable, it is unnecessary to determine that question since it does not appear from an examination of the record that either of the exhibits was identified. It does appear that the witness Whitson testified that Exhibit "B" was delivered to him by the Yard Clerk in an envelope, but such identification was insufficient. There does not appear to have been any identification whatever of Exhibit "C."

■ Defendant offered to prove by four witnesses that when they went to work on the switch crew in the plant— one in March, 1944, another in July, 1945, another in September, 1944, and the other in May, 1945—the Plant Transportation Officer informed each that they were under his orders and the orders of the employees of the plant, and not under the orders of the defendant, and that they should not accept or obey any orders given by any employee of the defendant because for all pratical purposes they were in the employ of the United States Government and not under the orders of the defendant. As the foregoing dates show, each of these proffered witnesses went to work at the plant long after plaintiff was injured. There was no indication in the record that any such statements were made to plaintiff or to any members of the switch crew prior to plaintiff's injury. The Court sustained an objection to the offer. It is defendant's theory that this evidence was admissible to show the arrangement existing at the time of plaintiff's injury. There was evidence that the same arrangement continued to exist after, as had existed at the time of the injury and prior thereto. Cases holding that evidence

---

[2] "(Defendant's Exhibit A)
9 January 45
T. Alwood
        Captain Hardin
Have given night foreman Tom Lockett, of TRRA crew, written request for setting of short docks in Motor Pool each evening, also instructions for placing of flat cars next to end loader box cars and placing of flat cars between every 5th or 6th drop end coal car on Motor Pool 4. These instructions are not being carried out, causing extra work and delay in switching of motor pool each morning.
                    T. A."

[3] "(Defendant's Exhibit B)
8 December 1944
Captain Hardin
      Train Foreman
1. Effective at once not more than 25 loads nor more than 35 empty cars will be handled on USA Engine No. 7084.
2. On USA Engine No. 7590 not more than 5 carloads nor more than 10 empty cars will be handled.
           Joe Hardin
             Capt., T. C. T. O."

"(Defendant's Exhibit C)
St. Louis Ordnance Depot
Interdepot Communication
Date: 8 December 1944      File No.
Subject:
From: Captain Hardin
          To: Train Engineer
At request of Zone Master Mechanic, U. S. Army, it is specifically directed that feed valve on straight air brake of USA Engine No. 7084 be set at not in excess of 35 pounds.
          Joe Hardin
           Captain, T. C.
           Transportation Officer."

showing conditions existing after an accident is admissible to show the condition existing at the time of an accident when there is evidence that there has been no change in those conditions, are cited by defendant in support of the propriety of this offer of proof. But that rule is not applicable to the present question. The offer of proof amounted to an offer to prove by these witnesses that the Plant Transportation Officer had told them a year or more after the accident what his conclusion was as to the purport and legal effect of the contractual arrangement theretofore entered into between the defendant, the plant officials and the Brotherhoods. There was no error in excluding this evidence.

■■■■■ Complaint is made concerning a statement of the Trial Court in its charge to the jury that, "it was the duty of a railroad company to furnish its employees with a reasonably safe place in which to work." That statement was made in connection with the general statement that the action was brought under the Federal Employers' Liability Act. Later in the charge when the Court came to charging the jury specifically respecting the basis of defendant's liability the following language was used:

" * * * it was the duty of the St. Louis Terminal Railroad Association to use reasonable care to provide a reasonably safe place for its employees to work * * * "

As stated in S. S. Kresge Co. v. McCallion, 8 Cir., 58 F.2d 931, 934, wherein a similar incident was under consideration, "the charge must be considered as a whole with the view of determining the impression conveyed thereby to the jury." The jury could not have been misled by the inadvertent general statement of the Court.

■■■■■ Preliminary to the statement of the opposing contentions of the parties, the Court in its charge read or stated to the jury substantially the language of the first paragraph of the Federal Employers' Liability Act. The charge then proceeded to state that it was plaintiff's contention that he was injured as a result of having been knocked from the side of a car by reason of a standard located too near the track, and that for that reason or in that connection defendant was negligent in failing to provide a reasonably safe place in which to work. The charge then hypothesized the facts necessary to a finding in favor of plaintiff and told the jury that if it found those facts its verdict would be for plaintiff. The charge then stated defendant's position and informed the jury the circumstances under which its verdict should be for defendant. Complaint is made that the statement to the jury that the Act provides that common carriers shall be liable "for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment," was misleading and confusing and was not applicable or limited to the issues, was too general, and gave the jury a roving commission.

The charge is not fairly subject to this criticism. It is not error for a Court to briefly state to the jury the statutory law upon which an action is based and then to point out the specific provisions of the Act which are being invoked in the cause on trial. Instead of being confusing, it is enlightening to the jury to understand what the basic law is, and it further tends to put the plaintiff's charge of negligence in the case on trial upon a more dispassionate basis if the jury understands that the lawmakers did not exaggerate the seriousness of that particular charge of negligence by enacting a statute especially covering the situation there complained of.

The judgment is affirmed.