**BALTIMORE & OHIO RAILROAD COM-PANY, Appellant,**

v.

**Lillyan McAMIS, Executrix of the Estate of Clinton L. McAmis, deceased, Appellee.**

**No. 12169.**

United States Court of Appeals, Sixth Circuit.

April 6, 1955.

Louis Seelbach, Louisville, Ky. (Gerald Kirven, Wilton R. Long, Jr., Middleton, Seelbach, Wolford, Willis & Cochran, Louisville, Ky., on the brief), for appellant.

Robert P. Hobson, Louisville, Ky. (John P. Sandidge, Woodward, Hobson & Fulton, Louisville, Ky., on the brief), for appellee.

Before SIMONS, Chief Judge, ALLEN and MILLER, Circuit Judges.

SIMONS, Chief Judge.

The appellant complains of a judgment entered against it upon a jury verdict for the death of the decedent killed in an accident on February 3, 1951, through the alleged negligence of appellant during a switching operation at Jeffersonville, Indiana, within the depot of the United States Army Quartermaster. The specifications of negligence here important include failure of the Railroad to furnish the decedent with a reasonably safe place to work and the violation of a Company rule, requiring an engine to stop when a signal lantern disappears from view. Following the overruling of the Railroad's motion for a new trial and for judgment notwithstanding the verdict, the Railroad appealed.

It becomes necessary, at the outset, to describe the situation existing at the depot. This is best made clear for us by a scale drawing of the layout of tracks and buildings, stipulated to be correct. Track No. 6 runs into the government property from the east. It runs west along and close to the platform of an adjacent building 760' long, crosses Dutch Lane, a north and south highway 20' wide, enters other government property and continues along other buildings of similar size. Entrance to the property at its east end is protected by a double swinging gate, which is under control of depot guards. Topping the gate are several strands of barbed wire. Two similar gates guard the depot on each side of Dutch Lane, likewise controlled by guards. Immediately within the east gate is a switch known as "Switch 4" which leads to a second track known as "Track 4". This runs parallel to Track 6 and westward through the gates at Dutch Lane into the westwardly government property. Track 4 runs close to and along buildings south of it, similar to those adjacent to Track 6.

The accident happened at 3 A. M. The night was dark, temperature well below zero and the ground covered by approximately ten inches of snow. A light engine of the railroad entered the premises on Track 6 through the east gate, opened by depot guards, to carry out a switching operation. The purpose of the movement was to proceed along Track 6, cross Dutch Lane through the two gates protecting it, pick up a cut of five freight cars, back the train to switch 4 at the easterly end of the depot, move southwesterly over switch 4 to Track 4 and there couple to a sixth car on Track 4, approximately midway between the switch and Dutch Lane. In pursuance of the operation, the engine after entering the depot moved along the full length of the building platform, crossed Dutch Lane and coupled to the five cars standing upon Track 6 in the westerly yard. Because of the extreme cold, all members of the train crew rode in the cab. They were the engineer Carroll, fireman Green, the decedent, McAmis, conductor, head brakeman Van Blaricum, and brakeman Dixon. Upon entering the depot at its east gate, the train stopped to permit brakeman Dixon to leave the engine and warm himself in the depot guard's automobile, parked near the east gates. McAmis said that he himself would handle the switching. Leaving Carroll, Green and Van Blaricum in the cab, he then mounted the footboard of the engine on its north side. The engine then proceeded at 3 miles an hour west on Track 6 through the gates at Dutch Lane and approached the five

cars on Track 6. Guard Grubbs, or his partner, had opened the Dutch Lane gates, after which the partner drove east to let the train into the first set of gates when it returned. Grubbs was left alone on the north side of Track 6 at the east edge of Dutch Lane. His duty was to watch for automobiles on Dutch Lane during the switching operation. When the engine stopped, McAmis left the head end of it, made the coupling to the five cars, and walked west on the platform of the adjacent buildings, to be sure that all were coupled. McAmis then gave the engineer a back-up signal with his lantern, stepped from the platform to the ladder at the west end of the middle car and with McAmis riding the ladder the train moved eastward.

Guard Grubbs testified that as the car on which a man was riding drew near the gate at the west side of Dutch Lane, a lantern dropped to the ground, rolled across Dutch Lane to the east side near where he was standing. Thinking that one of the trainmen would come back to claim it, he set it down upon the platform. This is the way, however, in which he described the incident: "I was standing there on the east side of Dutch Lane and, well, right at the edge of the road, and, as the train was coming out, he made some kind of movement, but he dropped his lantern at the edge of Dutch Lane and it hit and bounced clear over by me and I looked over and it seemed like he stepped up, or something, I couldn't tell. It was dark, I couldn't tell what kind of movement he did make, he dropped the lantern and it rolled over by me. I stooped down and picked it up. I walked over and set it on the abutment and waited for him to come back and pick it up, which I knew he could come off the car by the platform and come back and pick it up. So he didn't come back in a very little bit, so, I looked up the platform to see if I could see him coming and couldn't see him on the platform. There was a red light about a hundred yards or more from where I was standing. I looked at the train to see if I could see him on the car. It looked like he was still at the same place. I couldn't swear it, but it looked like he was."

There is cumulative testimony that the lantern picked up by Grubbs and placed upon the abutment was at all times alight. It could be seen from the engine cab throughout the movement of the train back to switch 4 and throughout its forward movement over switch 4 to Track 4. When the engine and its five cars reached switch 4, proceeding eastwardly, it stopped. There Van Blaricum got off, threw the switch, and upon his signal the train moved to Track 4. Carroll still seeing the lantern at Dutch Lane, and that it was stationary whistled for a signal from McAmis and receiving none stopped the train and called for brakeman Van Blaricum and Dixon. In response, Dixon came from the guard's car and started west along the platform of the north building to contact McAmis. As he was walking west, his flashlight directed to the tracks, revealed McAmis' body under the east truck of the middle car of the five-car train, the car on which McAmis had been riding. It was lying face down with about half of it across the north rail of Track 4. A brake shoe had to be removed to release his body from the trucks. McAmis was dead. Marks in the snow from switch 4 leading westwardly along Track 4 indicated that McAmis' body had been dragged about ten or twelve feet. The east wheel of the west truck and the west wheel of the east truck of the car had marks indicating they had run over McAmis. Van Blaricum found the dead man's watch lying on the frog of switch 4. Some of his clothing was on Track 6 about 15' east of Dutch Lane and other pieces of clothing were scattered all the way back down the track. There were no marks on the gates at Dutch Lane. A little piece of mackinaw was found about halfway between Dutch Lane and the east track entrance and the back of McAmis' watch about 300' east of the east gates of Dutch Lane. Small bits of clothing were scattered north of Track 6, blood beginning about 75' east of the point where the body was found, and

there were dips or brushes in the snow north of Track 6.

Paragraph 41, p. 55, of the Baltimore & Ohio Railroad Company Rules and Regulations of Operating Department, states the rule governing switching operations: "When an engine or train is moving under the direction of hand or lamp signal and the signals disappear, the engineer must immediately stop the engine and await further signal."

The first question we consider is whether engineer Carroll was negligent in failing to stop the train when the lantern went down at Dutch Lane. Carroll explains that he saw the lantern go down and assumed McAmis was hopping off the car. He knew that it was the conductor's custom and good railroad practice for McAmis to hop off the side of the car at that point for the purpose of crossing over to make the coupling on Track 4. This would save him from riding the cut all the way down on Track 6 to the switch and all the way back on Track 4 to the coupling. McAmis could in that way avoid riding the side of the car through the gate where the clearance was close. When he saw the signal lantern go down, but not out of sight, this confirmed his view of McAmis' intention. The appellant argues that since the train was then proceeding eastwardly, after signal, it couldn't have been moving under the direction of the lantern and it became Carroll's duty to keep a lookout eastwardly in the direction the train was proceeding. The train would return to the control of the lantern only after it reached switch 4 and was ready to return westwardly. Nothing in the conduct of the engineer, it urges, would justify submitting to the jury an issue as to whether the lantern had disappeared and whether Carroll should have stopped the train. Carroll, it says, did not constantly watch the lantern and, under the rule, had no obligation to do so.

This ignores the fact that the dropping of the lantern followed immediately

the back-up signal and the train had still to cross Dutch Lane where traffic might have been expected. Moreover, if Grubbs' testimony is believed and the accuracy of his observations accepted, it is incredible that Carroll could reasonably assume that McAmis had stepped from the train, carrying the lantern. Either he didn't watch the lantern, as seems demonstrated by his evidence on cross examination, that he never saw the lantern hit the ground, did not see it on the ground and did not see it when the guard picked it up, or watching it, came to a hasty and incautious conclusion in respect to it. The bounding and rolling of the lighted lantern should have warned him that McAmis was in some sort of trouble. No impediments obstructed his view. If he did not look, the lantern disappeared from view in the sense that the word "disappear" is used in the rule. If he looked, he should have immediately stopped the train, in compliance with the rule. If he did not look, he was guilty of negligence, under common law principles. In either case, it was a question for the jury.[1]

The other important charge of fault relates to the close clearance between the cars and the east gate at Dutch Lane. While there was some conflict in the evidence as to whether that gate opened eastwardly or westwardly, there was substantial evidence that the gate, when open, stands about 12′ or more from the east side of Dutch Lane, that there were no safety hooks or props to hold the gate flush with the abutment, that at that point the tracks curved to the left and the cars would tilt somewhat to the left. The clearance was concededly close. All of the witnesses so testified and the scale map so indicates. Bits of clothing were found about 15′ east of Dutch Lane. The appellee presents persuasive argument, reasonably based upon the evidence and the map, that the clearance between the side of the freight car and the platform would be not over 23.7 inches, reduced by the width of the steps of the ladder

---

1. Carroll apparently felt it his duty to keep a lookout to the west even after the backup signal, for he did see the lantern go down.

upon the side of the car, the diameter of the steel pole upon which the gate swings, and the tilt of the car, and there is evidence that the end of the gate stood approximately 3 inches from the abutment.

In response, the appellant makes the ingenious argument that it was physically impossibe for McAmis to have been knocked from the car by the gate, since he was found east of the ladder upon which he was riding and the force of the gate would have driven his body west of it. This assumes, however, that if his body came in contact with the gate, he was immediately swept from the car and that there was no intermediate struggle to save himself and to reach a place of safety. The jury was under no obligation to accept such assumptions, even if they had been articulated in argument. There can be little doubt that the passage of the train through the east gate at Dutch Lane presented a hazard to an employee riding the car and constituted an unsafe place for him to work. Terminal Railroad Association of St. Louis v. Fitzjohn, 8 Cir., 165 F.2d 473, 477, 1 A.L.R.2d 290; Stanczak v. Pennsylvania Railroad Co., 7 Cir., 174 F.2d 43.

The District Judge in overruling the Railroad's motion for judgment, notwithstanding the verdict, felt himself controlled by the teaching of Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916. We are of the view that even without the generalizations of that case, in respect to permissible speculation by the jury, there was sufficient circumstantial evidence of negligence and its proximate causal relation to the death of the decedent to submit the issue to the jury.

The appellant relies upon the decision in Moore v. Chesapeake & Ohio Railway Co., 340 U.S. 573, 71 S.Ct. 428, 430, 95 L.Ed. 547, as though it were in disapproval of the doctrine of Lavender v. Kurn, supra. The Moore case does not even mention Lavender v. Kurn, either in its majority or minority opinion. Granted that it is a narrow line which distinguishes speculation from reasonable inference, there was complete absence of proof in the Moore case and the circumstances here are far from justifying the conclusion reached in Moore, that "This would be speculation run riot. Speculation cannot supply the place of proof."

The judgment is affirmed.

MILLER, Circuit Judge (dissenting).

I concur in the view of the majority of the Court that the District Judge properly ruled that the evidence was sufficient to take the case to the jury on the question of appellant's failure to furnish the decedent a reasonably safe place in which to work. I am of the opinion, however, that the District Judge was in error in also submitting to the jury the question of appellant's negligence by reason of Engineer Carroll's failure to stop the train if the lantern signal disappeared.

The engineer testified that he did not see the lantern hit the ground and that it did not go out of his sight. Liability would accordingly have to be based upon his failure to see it disappear when he should have been watching it and wasn't. But, assuming there was a failure to see it disappear because he wasn't looking, such failure was not negligence in the present case. It was not his duty to watch the lantern after the decedent completed the coupling operation and had started the train on its backward trip. The train was moving away from the lantern which was no longer being used as a signal, not towards it. Paragraph 41 of the Rules and Regulations of Operating Department of the Railroad Company was not applicable to the movement of the train at the time it is claimed the lantern disappeared from sight in that it was not then "moving under the direction of hand or lamp signals." It was the duty of the engineer to watch the track ahead of him, not the lantern behind him.

Since a finding of liability by the jury was authorized under either theory of negligence, and the verdict was a general one, I am of the opinion that the judgment should be reversed.